## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ERIC R. BAHE, Custodian, CGM Roth Conversion IRA,**<br><br>    **Plaintiff,**<br><br>**VS.**<br><br>**FRANKLIN/TEMPLETON DISTRIBUTORS, INC., FRANK T. CROHN, BURTON J. GREENWALD, CHARLES RUBENS II, LEONARD RUBIN, and WILLIAM J. LIPPMAN,**<br><br>    **Defendants, and**<br><br>**FRANKLIN BALANCE SHEET INVESTMENT FUND,**<br><br>    **Nominal Defendant.** | **Civil Action No. 04-11195-MLW** |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

### INTRODUCTION

This is an action brought by the Plaintiff, Eric R. Bahe, Custodian, CGM Roth Conversion IRA, derivatively on behalf of the Franklin Balance Sheet Investment Fund (the "Fund"), in which the Plaintiff is a shareholder. (Complaint, ¶ 6). The Fund is a mutual fund which is an open-end management company, registered under the Investment Company Act of 1940 (the "1940 Act"). The Fund is a series of the Franklin Value Investors Trust (the "Trust"), a Massachusetts business trust, organized and governed pursuant to Massachusetts law. (Complaint, ¶¶ 8, 17-18). This action is brought against the defendant, Franklin/Templeton Distributors, Inc. ("Distributors"), the Principal Underwriter

of the Fund's shares, for breach of fiduciary duty in violation of Section 36(b) of the 1940 Act (Count I); and against Distributors and the Trustees of the Fund – Defendants Lippman, Crohn, Greenwald, Rubens and Rubin (the "Trustee Defendants") – for breach of fiduciary duty under Massachusetts law (Counts II and III, respectively).   The Plaintiff seeks to recover for the Fund excessive SEC Rule 12b-1 distribution fees paid by the Fund to Distributors.

The Defendants have moved, in two submissions, one by Distributors and the Defendant Lippman and the second by the four other Trustee Defendants, to dismiss the Plaintiff's complaint (the "Motions").   The Plaintiff submits this memorandum of law in opposition to both of the Motions.  Plaintiff's opposition to the Motions is also supported by the Declaration of Rose Alappat in Opposition to Defendants' Motions to Dismiss (the "Alappat Declaration" or the "Alappat Decl."), filed herewith.

The Trustee Defendants argue that this Court does not have personal jurisdiction over them; that venue in this Court is not proper; and that the Plaintiff should have made demand upon them to bring the breach of fiduciary duty action on behalf of the Fund.  The Trustee Defendants do not assert that the Complaint is deficient, in any way, in alleging a breach of fiduciary duty claim against them.

The Defendant Distributors does not challenge this Court's jurisdiction over it and does not claim that venue is improper.   Rather, its Motion to Dismiss is limited to an erroneous legal argument seeking dismissal of the Sec 36(b) Count against it; and its assertion that the Plaintiff should have made demand upon the Defendant Trustees to bring

2

the Massachusetts breach of fiduciary duty claim against it.[1]

## THIS COURT HAS PERSONAL JURISDICTION OVER THE TRUSTEE DEFENDANTS

The Trustee Defendants claim that this Court does not have personal jurisdiction over them because they are not amenable to service of process under the Massachusetts long-arm statute, M.G.L. Ch. 223A, § 3. In interpreting that statute the Massachusetts Supreme Judicial Court held as follows: "We see the function of the long arm statute [M.G.L. Ch. 223A, § 3] as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States." *'Automatic' Sprinkler Corporation of America v. Seneca Foods Corporation*, 361 Mass. 441, 443, 280 N.E. 2d 423, 424 (1972). In that decision the SJC also recognized that to meet that constitutional test, "**there** [must] **be some act by which the defendant purposely ... invok[es] the benefits and protections of [Massachusetts'] laws.**" *'Automatic' Sprinkler* 280 N.E. 2d at 425, emphasis added. As demonstrated below, and in the Alappat Declaration the Defendant Trustees have taken repeated acts which satisfy that constitutional requirement and hence make them amenable to service of process under M.G.L. Ch. 223A, § 3.

## The Defendant Trustees' Contacts with Massachusetts

---

[1]    The Defendant Distributors does not, as it cannot, argue that demand on the Trustee Defendants should have been made with respect to the Sec. 36(b) claim set forth in Count I of the Complaint. *See Daily Income* Fund*, Inc. v. Fox,* 464 U.S. 523, 104 S.Ct. 831 (1984) and Complaint, ¶¶ 62 - 64.

The Fund is a series of a Massachusetts business trust, organized pursuant to and governed by the laws of the Commonwealth of Massachusetts.  (Complaint, ¶¶ 8, 17 - 18). The Trust was formed by the Defendant Lippman on September 11, 1989, when he signed the Agreement and Declaration of Trust of Franklin Balance Sheet Investment Fund (the "Declaration of Trust")  (Alappat Decl., Ex. B) and filed or caused it to be filed with the Secretary of the Commonwealth of Massachusetts.  When he signed the Declaration of Trust, as trustee of the Trust, Lippman expressly directed that it be filed in Massachusetts with the Secretary of the Commonwealth.  Specifically, in the Declaration of Trust Lippman (and his co-trustee)[2] said:

> ...the Trustees hereby direct that this Agreement and Declaration of Trust be filed with the Secretary of the Commonwealth of Massachusetts...

and

> A copy of this instrument and each amendment hereto shall be filed by the Trust with the Secretary of the Commonwealth of Massachusetts...

(*Id* at 1 and 19).

In 1989, shortly after Lippman's creation of the Trust, the Defendants Crohn, Rubens and Rubin joined Lippman as Trustees of the Trust, and they have so served, along with the Lippman, continuously to the present.   (Complaint, ¶¶ 9, 11 and 12).  The Defendant Greenwald became a trustee of the Trust in 2001.  (Complaint ¶ 10).

Article VIII, Section 7 of the Declaration of Trust provides as follows:

> Section 7.    Applicable Law.    **This  Agreement and**

---

[2]      The Declaration of Trust was also signed by a second trustee, who is no longer a trustee and is not a party in this action.

**Declaration of Trust is created under and is to be governed by and construed and administered according to the laws of The Commonwealth of Massachusetts.** The Trust shall be of the type commonly called a Massachusetts business trust, and without limiting the provisions hereof, the Trust may exercise all powers which are ordinarily exercised by such a trust.

(*See* Alappat Declaration, Ex. B and Complaint, ¶ 18, emphasis added.)

Hence, in agreeing to be trustees of this Massachusetts Trust, the Trustee Defendants took "...**act[s] by which the defendant[s] purposely ... invok[ed] the benefits and protections of [Massachusetts'] laws.**'" *'Automatic' Sprinkler* 280 N.E. 2d at 425, emphasis added, and accordingly they are fully amenable to service of process under M.G.L. Ch. 223A, § 3.

After volunteering to become trustees of the Trust, the Trustee Defendants engaged in regular, continuous and systematic Massachusetts activities.  For example:

- On September 21, 1995, the Trustee Defendants Lippman, Crohn, Rubens and Rubin signed and filed with the Secretary of the Commonwealth, a Certificate of Amendment to the Declaration of Trust.  (Alappat Decl., Ex. C).

- In 1989, the Defendants Rubin and Lippman signed, under oath,  and filed with the Secretary of the Commonwealth, the Trust's Report of Voluntary Associations and Trusts (the "Annual Report") for the year 1989  (Alappat Decl., Ex. D).  They did so pursuant to M.G.L. Ch. 182, § 12, which mandates that the trustees of a Massachusetts trust file an Annual Report with the Secretary of the Commonwealth, signed under oath by the trustees of the trust.[3]  In each of the years 1991, 1992, 1993, 1994, 1995, 1996, 1997 and 1998, the Defendants Rubin and Lippman signed, under oath, and filed with the Secretary of the Commonwealth, the Trust's Annual Report for the years 1991, 1992, 1993, 1994, 1995, 1996, 1997 and 1998.  (Alappat Decl., Exhibits E, F, G, H, I, J, K, and L).

---

[3]    As reflected in Exhibit D to the Alappat Declaration, if a trust, like the Trust here, has more than two trustees, the Secretary of the Commonwealth requires the annual report to be signed, under oath, by at least two of the trustees.

- In each of the years 1999, 2000 and 2001, the Defendants Rubens and Lippman signed, under oath, and filed with the Secretary of the Commonwealth, the Trust's Annual Report for the years 1999, 2000 and 2001. (Alappat Decl., Exhibits M, N and O).

- On July 3, 2002, the Defendants Greenwald and Lippman signed, under oath, and filed with the Secretary of the Commonwealth, the Trust's Annual Report for the year 2002 (Alappat Decl., Ex. P).

- On May 28, 2003 and May 20 2004, the Defendants Crohn and Lippman signed and filed with the Secretary of the Commonwealth, the Trust's Annual Reports for the years 2003 and 2004. (Alappat Decl., Ex. Q and R).

Significantly, the Defendant Trustees' Massachusetts activities are not limited to the activities described above concerning the Trust at issue in this action. The Defendants Lippman, Crohn, Rubens and Rubin were also Trustees of the Franklin Managed Trust, another trust organized under Massachusetts law. As reflected in paragraphs 24 through 32 of the Alappat Declaration and Exhibits S through Y thereto, as Trustees of the Franklin Managed Trust, those Defendants repeatedly filed documents signed by them with the Secretary of the Commonwealth of Massachusetts.

The documentary record submitted herewith demonstrates that the Trustee Defendants have, for the past two decades, engaged in repeated, systematic Massachusetts activities, which make them fully amenable to the jurisdiction of this Court pursuant to M.G.L. Ch. 223A, §3(a).

In *United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corporation*, 960 F. 2d 1080 (1st Cir. 1992), the First Circuit analyzed the constitutional requirements for the assertion of long arm jurisdiction. The court began by observing that:

> Both federal and state courts have regularly construed the "transacting any business" language of the statute [M.G.L. Ch. 223A, § 3(a)] in a generous manner...[citations omitted]. **The defendant need not have a physical presence in**

> **Massachusetts**. [citation omitted]...even somewhat exiguous acts on a defendant's part can, at times, suffice to satisfy the long-arm statute's threshold for transacting business. *See, e.g.,* [*Bond Leather Co.,* 764 F. 2d 928 (1st Cir. 1985] at 932 (mailing four letters into Massachusetts "evidencing a single guaranty of payment for goods sold"); *Hahn* [*v. Vermont Law School*, 698 F. 2d 48 (1st Cir. 1983)] at 51 (mailing application information and acceptance letter to plaintiff in Massachusetts); *Nova [Biomedical Corp. v. Moller,* 629 F. 2d 190 (1st Cir. 1980)] at 195, 197 (mailing two letters ... into Massachusetts)...

*Id* at 1087, emphasis added.

The First Circuit went on to reiterate the Supreme Court's requirements that:

- the defendant's contacts with the forum state be sufficient that "...subjecting him, her, or it to the forum's jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Id* at 1087, quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945); and that

- "a defendant's 'conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there.'" *Id* at 1088, quoting *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980).

- subjecting a nonresident to the authority of a foreign court should be fair, in light of the criteria discussed by the Supreme Court in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S. Ct. 2174, 2184 (1985), which the First Circuit has called the "Gestalt factors."[4]

---

[4]    The Gestalt factors are:

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in

From that Supreme Court jurisprudence, the First Circuit, established the following "tripartite test" for determining whether party can be subject to personal jurisdiction in Massachusetts pursuant to M.G.L. Ch. 223A, § 3.

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities.
>
> Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby involving the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.
>
> Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*United Electrical* at 1089

The Trustee Defendants' significant and repeated contacts with Massachusetts, as set forth above and in the Alappat Declaration, more than adequately satisfy those requirements for the assertion by this Court of personal jurisdiction over the Trustee Defendants.

First, the Trustee Defendants are sued here for breach of their fiduciary duty, as trustees of the Fund, under Massachusetts law. That claim not only "arises directly out of, or relates to, the defendant[s'] forum-state activities," (*Id*); its very foundation – the fact that these defendants are trustees of the Fund and that their conduct as trustees is governed by Massachusetts fiduciary duty law, which Plaintiff claims they have violated – arises

---

obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*United Electrical* at 1088.

completely from their forum-state activities of signing and filing the Declaration of Trust and the other trust related documents with the Secretary of the Commonwealth of Massachusetts.

Second, by volunteering to be trustees of a Massachusetts trust, and signing the Declaration of Trust which provides that it "**is to be governed by and construed and administered according to the laws of The Commonwealth of Massachusetts**..." (Alappat Decl., B, at Article VIII, Section 7, emphasis added) the Defendant Trustees "... invok[ed] the benefits and protections of [Massachusetts'] laws [and made] the defendant[s'] involuntary presence before the [federal court in Massachusetts] foreseeable." (*Id*).

Third, the application of the relevant Gestalt factors also demonstrates that requiring the Trustee Defendants to appear and defend themselves in this Court is more than fair. Specifically:

    1.   <u>The defendants' burden of appearing.</u>

The litigation of this action in this Court would not place any unreasonable burden upon the Trustee Defendants, and they do not argue to the contrary. Four of the five Trustee Defendants live relatively close to Boston: two, Crohn and Rubens, live in New York (Complaint ¶¶ 9 and 11); Lippman lives in New Jersey (Complaint ¶ 13); and Greenwald lives in Philadelphia, Pennsylvania (Complaint ¶ 10). Furthermore, as is usually the practice, the depositions of the Trustee Defendants can take place where they reside or work, regardless of the location of the Court.

It should be noted that the fact that the Funds are organized under Massachusetts

law, as part of a Massachusetts business trust, is not happenstance. The Defendants chose to so organize the Funds in order to have the benefits of Massachusetts law with respect to such trusts. Having chosen to organize the Funds under Massachusetts law, and having chosen to then enter into agreements with the Funds which caused them to assume fiduciary duties to the Funds and the shareholders of the Funds under Massachusetts law, the Defendants could not reasonably complain that they have been sued, on behalf of the Funds, in Massachusetts, or that it would be an unreasonable burden on them to defend this action in this Court.[5]

2.    Massachusetts Has a Far Greater Interest in the Resolution of This Action Than Any Other State.

This case implicates the conduct of Defendants who are fiduciaries of mutual funds organized under Massachusetts law and makes claims against the Defendants for breach of their fiduciary duties under Massachusetts law. *See, e.g.*, Complaint, ¶¶ 1, 2, 17, 52-56 and 82-84. Therefore, the interests of justice would best be served by litigating this case in Massachusetts. *See, e.g., Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 824 & n. 20 (D. Mass. 1990).

This Court has recognized that there is a "strong judicial interest" in litigating an action arising under state law in a forum within that state. *Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 824 (D. Mass. 1990). Thus, it is more appropriate to adjudicate an action in the court that "is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflicts of laws and in law foreign to

---

[5]    *In re ING Principal Protection Funds Derivative Litigation*, No. 03-12198-JLT, as the case at bar, involves Rule 12b-1 fees being paid by mutual funds organized under Massachusetts law. In *ING*, the Defendants moved for a change of venue to the District of Arizona, arguing, *inter alia*, that litigating the case in this Court would be burdensome. Judge Tauro summarily denied the motion to transfer on May 3, 2004.

10

itself." *Id.* at 824 n.20 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)). *See also Wellons v. Numerica Savings Bank, FSB*, 749 F. Supp. 336, 337 (D. Mass. 1990) (finding that fact that New Hampshire law applied to dispute "weigh[ed] heavily" in favor of case being litigated in federal court in New Hampshire).

     3.     The plaintiff's interest in obtaining convenient and effective relief.

The First Circuit has stated, "Our cases recognize that courts 'must accord deference to the plaintiff's choice of forum.'" *U.S. v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 635-636 (1st Cir. 2001) citing *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708 (1st Cir. 1996). In applying this Gestalt factor, in *Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 12 (1st Cir. 2002), the First Circuit observed that the forum chosen by the plaintiff would not "have any difficulty rendering effective relief" if the plaintiff tried his case there and won. Id.

There is nothing about this case that suggests that this Court will have any difficulty rendering effective relief if the case is tried here. As such, and in light of the deference that must be accorded Plaintiff's choice of this forum, this third Gestalt factor favors a finding of personal jurisdiction.

     4.     The judicial system's interest in obtaining the most effective resolution of the controversy.

Here, the judicial system has no interest favoring this or any alternative jurisdiction for the effective resolution of this matter. This outcome is not uncommon. With respect to this fourth Gestalt factor, the First Circuit has stated that, "Usually this factor is a wash." *Nowak*, 94 F.3d at 718 cited in *Merced v. JLG Indus., Inc.*, 170 F. Supp. 2d 65, 76 (D. Mass. 2001)(finding fourth factor to be a wash) and *Edwards v. Radventures, Inc.*, 164 F.

Supp. 2d 190, 199 (D. Mass. 2001)(same). *See* also, *First Act, Inc. v. Brook Mays Music Co.*, 311 F. Supp. 2d 258, 261 (D. Mass. 2004)(permitting the exercise of personal jurisdiction after finding that the fourth and fifth factors "do not greatly influence the Court's analysis"); and *Rooney v. Walt Disney World Co.*, 2003 WL 22937728, *4-5 (same result after finding that the fourth and fifth factors "do nothing to tip the constitutional inquiry").

     5.    <u>The common interest of all sovereigns in promoting substantive social policies</u>.

     Regarding the fifth Gestalt factor, Courts in this Circuit have considered whether at issue is a business arrangement with a Massachusetts entity and governed by Massachusetts law. *See*, *e.g.*, *Champion Exposition Serv., Inc. v. Hi-Tech Elec., LLC,* 273 F. Supp. 2d 172, 179 (D. Mass. 2003). Finally, courts have noted when a jurisdiction is host to other related lawsuits. *See*, e.g., *In re: Lernout & Houspie Sec. Litig.*, 2004 WL 2137371, *12 (D. Mass. Sept. 8, 2004).

     Here, as previously stated, the Fund is a series of a Massachusetts business trust, formed by trust documents filed in Massachusetts and governed by their express terms by Massachusetts law. The Trustees have engaged in continuous, systematic contacts in Massachusetts both with respect to the Massachusetts business trusts at issue in this litigation and with respect to other Massachusetts business trusts for which they serve as trustees. Furthermore, this Court is host to other lawsuits involving similar allegations on behalf of Massachusetts business trusts, including *In re ING Principal Protection Funds Derivative Litigation*, C.A. No. 03-12198 JLT and *Michelle Yameen v. Eaton Vance Distributors Inc., derivatively on behalf of Eaton Vance Tax Managed Growth Fund 1.1*, Civil Action No. 03-12437-RCL. For all these reasons, this Court has a strong and clear

interest in obtaining jurisdiction over this matter, and this fifth Gestalt factor favors a finding of jurisdiction.

In light of all of the facts, and pursuant to the controlling jurisprudence, discussed above, this Court has personal jurisdiction over each of the Defendant Trustees.[6]


### VENUE OF THIS ACTION IS PROPER IN THIS DISTRICT

Trustee Defendants assert that venue of this action does not lie in this Court because none of the criteria set forth in 28 U.S.C. §1391(b)(1), (2) or (3) are met. However, in so arguing the Trustee Defendants ignore the critical proviso in §1391(b), which eviscerates their argument.  Specifically, §1391(b) provides that:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, **except as otherwise provided by law,** be brought only in [the judicial districts described in subsections (1), (2) and (3)] (emphasis added).

Here, Section 44 of the 1940 Act establishes broad venue for actions, like the action at bar, brought pursuant to the 1940 Act.  There is no question, and the Defendants do not argue to the contrary, that pursuant to Section 44 of the 1940 Act, venue in this Court is proper with respect to the claim brought in Count I of the Complaint pursuant to Section

---

[6]    If, for any reason, the Court does not conclude that the facts submitted herewith demonstrate this Court's personal jurisdiction over any of the Defendant Trustees, the Plaintiff would request that the Court defer ruling on this issue until the Plaintiff has had the opportunity to obtain discovery from the Trustee Defendants regarding their contacts with Massachusetts.  In this regard, the Plaintiff observes that the five identical declarations submitted by the Trustee Defendants only discuss certain limited aspects of their conduct as Trustees of the Trust. Significantly, the Trustee Defendants failed to acknowledge in their Declarations their repeated filing of documents concerning the Trust, signed by them, often under oath, with the office of the Secretary of the Commonwealth.  Furthermore, in their Declarations the Trustee Defendants do not discuss, at all, any other contacts which they may have with the Commonwealth; nor do they deny having any other contacts with the Commonwealth.

13

36(b) of the 1940 Act.  Likewise, the Defendant Distributor does not argue that venue is improper with respect to the Massachusetts breach of fiduciary duty claim brought against it in Count II of the Complaint.

As is apparent from the detailed allegations in the Complaint at bar, Plaintiff's claims against the Defendant Distributors for breach of fiduciary duty under Section 36(b) of the 1940 Act and Massachusetts law, and Plaintiff's claims for breach of fiduciary duty under Massachusetts law against the Trustee Defendants in Count III of the Complaint, all arise out of a common nucleus of operative facts – i.e., the payments by the Fund, to Distributors, of Rule 12b-1 Distribution Fees, after the Fund was closed to new investors. Under these circumstances, this Court can, and should, exercise pendant venue over all of the claims in this action.

The concept of pendant venue was discussed and analyzed at length by the United States Court of Appeals for the District of Columbia Circuit in *Beattie v. United States*, 756 F. 2d 91 (1984).  In *Beattie* the Court said:

> The general rule is that venue must be established as to each separate cause of action.  However, as one commentator has explained, the focus is on the word *separate*. Professor Moore notes, that when the case involves a federal and non-federal claim . . . *if they amount to only one cause of action* with two grounds for relief, proper venue as to one federal ground will support adjudication of both grounds . . .

> Applying that principle to the present case, it is clear that this litigation can accurately be described as a single cause of action with separate grounds for relief.  Plaintiffs seek damage for "an essentially single wrong. . ." [quoting *Hurn v. Oursler*, 289 U.S.C. 238, 246, 53 Sp. Ct. 586, 590 (1933)].

> [The] familiar concept [of pendant jurisdiction] has also spilled over into the rules of venue.  The doctrine of "pendant venue" is now well established. . .

14

* * *

> Whether to apply the principle of pendant venue in any given case is a discretionary decision based on applicable policy considerations. Some of these considerations will be the same as those that support the exercise of pendant jurisdiction – judicial economy, convenience, avoidance of piecemeal litigation, and fairness to the litigants. . .

*Id.* at 100, 101 and 104, emphasis in original.

Plaintiff submits that the considerations articulated by the District of Columbia Circuit in *Beattie*, as set forth above, fully warrants this Court exercising pendant venue in this case over the common law breach of fiduciary duty claims against the Trustee Defendants, just as the Court did in *Pacer Global Logistics, Inc. v. National Passenger Railroad Corp.*, 272 F. Supp. 2d 784 (E.D. Wis, 2003). In *Pacer*, as here, Plaintiff asserted a federal cause of action under a federal statute which contained a special venue provision.[7] Venue was unquestionably proper in the Eastern District of Wisconsin with respect to Plaintiff's Carmack Amendment claims against the Defendants sued under the Carmack Amendment. However, as here, the Plaintiff also was asserting a state law claim against an additional defendant, Jimco Construction ("Jimco"). Plaintiff did not have a Carmack Amendment or any other federal claim against Jimco. As the Trustee Defendants do here, Jimco sought dismissal of the action against it on the grounds that venue for the state law claims against it was not proper pursuant to §1391(b). The Court rejected that argument, holding that it had pendant venue over the claims against Jimco. In so ruling, the *Pacer* Court reasoned and held as follows:

---

[7]    In *Pacer*, the federal claim was under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. §11707. The special venue provision was found at 49 U.S.C. §11706(d)(2)(A)(i).

. . . Under the rule that venue must be proper for each claim, it would seem that Pacer's claim against Jimco should be dismissed or transferred.  Yet, this outcome is unsatisfactory for it undermines the very goals of judicial economy, fairness to litigants, and convenience to parties and witnesses on which venue is based.  **If two or more claims arise out of the same set of facts, it is wasteful of judicial resources and unfair to one or more of the parties to require that the claims be litigated in separate judicial districts**.

\* \* \*

A number of courts have invoked the doctrine of pendant venue to avoid having to dismiss or bifurcate claims that are based on the same underlying facts as properly venued claims (citations omitted).

\* \* \*

. . . the doctrine of pendant venue can be reconciled with federal venue statutes in a way that furthers the goals of venue, i.e. judicial economy, fairness, and convenience to litigants and witnesses, and, at the same time, respects the language and intent of the venue statutes. [Citation omitted.] This reconciliation can be accomplished by applying the following analysis.

First, when a plaintiff brings multiple claims, all of the claims that arise out of the same nucleus of operative facts should be considered one cause of action for venue purposes (citations omitted).

\* \* \*

Third, as stated, the general venue statute provides venue in cases where venue has not been "otherwise provided by law."  28 U.S.C. §§1391(a) & (b).  It follows that if a special venue statute limits the venue of one on the claims that make up the plaintiff's cause of action, then venue of the cause of action has been "otherwise provided by law" and the general venue provision no longer governs. . .

To summarize, where a special venue provision lays venue of a claim in certain specified districts, such provision

16

> controls venue for all claims arising out of the same nucleus of operative facts. This is so because all such claims may be classified as one cause of action for purposes of venue. Any claim governed by the general venue statute that is part of the cause of action may be brought in the district specified by the special venue statute under the doctrine of pendant venue.

*Id.* at 789 - 791, emphasis added.

The reasoning, rationale and holding in *Pacer* is precisely applicable to the case at bar. As the *Pacer* court did with respect to the state law claims against Jimco, this court has and should take pendant venue over the common law breach of fiduciary duty claims against the Trustee Defendants in this action.

## DEMAND ON THE TRUSTEES WOULD HAVE BEEN FUTILE AND HENCE IT IS EXCUSED

The Defendant Trustees and Distributors seek dismissal of the Massachusetts breach of fiduciary duty claims against them because the plaintiff did not make pre-suit demand on the Defendant Trustees to bring these claims on behalf of the Fund. That motion must be denied because, as demonstrated by the detailed and specific pleadings in the Complaint, demand would have been futile and hence is excused.

In *Daily Income* Fund*, Inc. v. Fox,* 464 U.S. 523, 104 S.Ct. 831 (1984) the Supreme Court held that a shareholder of a mutual fund is not required to make pre-suit demand on the fund's trustees before bringing a derivative action on behalf of the fund pursuant to Sec. 36(b) of the Investment Company Act of 1940 (the "1940 Act"). Count I of the Complaint asserts a Sec. 36(b) claim against the Defendant Distributors. Distributors does not, as it could not in light of the Supreme Court's holding in *Daily Income*, seek dismissal of that Count against it because plaintiff did not make pre-suit demand on the Trustees. Rather,

17

this aspect of the motions to dismiss is limited to the breach of fiduciary duty claims asserted against the Trustee Defendants and Distributors in Counts II and III of the Complaint.

The utter futility of demand here is demonstrated throughout the Complaint. At issue here are the more than $15 million of Rule 12b-1 fees which the Defendant Trustees have, since the Fund closed to new investors on May 1, 2002, caused and allowed, and continue to cause and allow, the Fund to pay to the Defendant Distributors. *See* ¶¶ 42 - 44 of the Complaint. Rule 12b-1 requires the trustees of a fund to affirmatively vote to continue all Rule 12b-1 plans and agreements at least once each year (Rule 12b-1(b)(3)(i)) and to review at least quarterly the payments made by the Fund, and the purposes for which the payments were made, under the plan (Rule 12b-1(b)(3)(ii)). Furthermore, the Fund's Rule 12b-1 Plan can be, as it must be under Rule 12b-1(b)(3)(iii), terminated by the Trustees "at any time" without penalty. See ¶¶ 33, 39-41 of the Complaint.

The Trustees of the Fund have, on at least two occasions since the Fund was closed to new investors, voted affirmatively to continue the Fund's Rule 12b-1 Plan and Agreement. Furthermore, the Trustees have reviewed the Fund's Rule 12b-1 expenditures pursuant to Rule 12b-1(b)(3)(ii) on at least eight occasions since the Fund was closed to new investors. Those reviews would have demonstrated to the Trustees that the Fund's Rule 12b-1 expenditures during each quarter were not "primarily intended to [and did not] result in the sale of shares issued by the [Fund]." Rule 12b-1(a)(2). Nevertheless, the Trustees did not, after any of those reviews, terminate those continuing payments to the Defendant Distributor. Complaint, ¶40. Under these circumstances, it is obvious that making a "demand" upon the Trustees that they bring this lawsuit, which seeks, *inter alia*,

18

to enjoin the Defendants from continuing those Rule 12b-1 payments, and to recover the millions of dollars of past payments since the Fund closed to new investors, would be utterly futile.

In *Daily Income Fund*, Justice Stevens succinctly stated why demand would be futile under these circumstances:

> . . . a demand requirement would serve no meaningful purpose . . . the contract between the fund and its investment advisor had been expressly approved by the independent directors of the fund. Since the disinterested directors are required to review and approve all advisory fee contracts under §15 of the Act. . . a demand would be a futile gesture after directors have already passed on the contract. . . .

464 U.S. at 546 (Stevens, J., concurring).

The Massachusetts Supreme Judicial Court, in *Harhen v. Brown*, 431 Mass. 838, 730 N.E. 2d 859 (2000), set forth the criteria in Massachusetts for determining demand futility in the analogous corporate context. In *Harhen* the SJC explained, as Justice Stevens articulated in *Daily Income Fund,* that a "plaintiff [is] not required to make demand on board of directors when demand would be 'useless' or 'an idle ceremony'" and the SJC reaffirmed the principle that "...if a majority of directors are alleged to have participated in wrongdoing ... a plaintiff may seek to have the demand on the board excused as futile." (*Id at 865).* The SJC also set forth the pleading standard required of a plaintiff in order to prevail on a claim of demand futility when a majority of the board are named as defendants. Adopting the ALI Principles of Corporate Governance, the SJC said that demand would be futile if:

    a.     majority of the directors are defendants who "approved of or acquiesced in the transaction or conduct that is the subject of the action;" and

      b.      the complaint alleges "...with particularity facts that, if true, raise a significant prospect that the director[s] would be adjudged liable to the corporation or its shareholders." (*Id* at 865, fn. 5, quoting 1 ALI Principles of Corporate Governance: Analysis and Recommendations § 1.23 (1994)).[8]

It is undisputed that all of the Trustee Defendants "approved of or acquiesced in the transaction or conduct that is the subject of the action" (Complaint, ¶¶ 35 - 41). Furthermore, as demonstrated below, the Complaint more than adequately alleges facts with particularity which, if true, "raise a significant prospect" that the Trustees will be adjudged liable to the Fund.


## AN OVERVIEW OF RULE 12b-1[9]

      To demonstrate the strength of the claims asserted here against the Defendants, we begin with an overview of SEC Rule 12b-1, which lies at the core of this action.

      Prior to the promulgation of Rule 12b-1 in 1980, it was unlawful for an open-end management company registered under the 1940 Act to use its assets, directly or indirectly, to pay for or finance costs of selling or distributing shares in that investment company. However, since the promulgation of Rule 12b-1, registered open-end management

---

[8]       The *Harhen* criteria is no longer applicable to Massachusetts corporations because, in 2004, M.G.L. Ch. 156D, §7.42 was enacted, which requires pre-suit demand in all derivative actions on behalf of a Massachusetts corporation. That statute does not apply to the situation at bar, involving a trust, and the Defendants do not argue to the contrary. Indeed, as discussed below, the legislature's passing of this statute, which does not apply to trusts, demonstrates that the *Harhen* criteria for determining if demand was futile and hence excused is still applicable to derivative actions on behalf of trusts.

[9]       For the Court's convenience, a copy of Rule 12b-1 is attached hereto as Exhibit A.

investment companies, like the Fund, are permitted to use their assets to pay for activities which are:

> **primarily intended to result in the sale of shares issued by such company**, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature.

Rule 12b-1(a)(2) (emphasis added).

A mutual fund's assets may only be used for those purposes if the expenditures are made in conformance with the express, restrictive, provisions of Rule 12b-1. Those provisions require that any such expenditures must be pursuant a written plan "...describing all material aspects of the proposed financing of distribution..." and that "...all agreements with any person relating to implementation of the plan [must be] in writing..." Rule 12b-1(b). Furthermore, and most significantly to the claim at bar, **those written plans and agreements may not commit the mutual fund to make any such payments, or to assume the liability for any such payments, for longer than 60 days.**

That fundamental requirement of Rule 12b-1 is codified in the following provisions:

- Rule 12b-1(b)(3)(iii) provides that the distribution plan required by Rule 12b-1(b) must provide that "...**it may be terminated at any time**..." by the fund's trustees (emphasis added);

- Rule 12b-1(b)(3)(iv)(A) provides that the written distribution agreement (between a mutual fund and an underwriter) required by Rule 12b-1(b) must provide that "... it may be terminated at any time, without the payment of any penalty, by a vote of a majority of the members of the board of directors [who

are "disinterested"] ... **on not more than sixty days' written notice** to any other party to the agreement..." (emphasis added).

Furthermore, Rule 12b-1 also requires constant review by the mutual fund's trustees to determine whether the mutual fund's assets should continue to be used to pay for the costs of distributing the fund's shares to the public.  Specifically:

- Rule 12b-1(b)(3)(i) prohibits a plan or agreement to continue in effect for more than one year unless  "...such continuance is specifically approved at least annually in the manner described in paragraph (b)(2);[10]

- Rule 12b-1(d) provides that:

    > In considering whether a [mutual fund] should ... continue a plan in reliance on paragraph (b) of this rule, the directors of such company shall have a duty to request and evaluate ... such information as may reasonably be necessary to an informed determination of whether such plan should be ... continued; in fulfilling their duties under this paragraph the directors should consider and give appropriate weight to all pertinent factors considered...

- **Rule 12b-1(e) provides that a plan or agreement may not be continued unless:**

    > **...the directors** who vote to approve such ... continuation **conclude**, in the exercise of reasonable business judgment and **in light of their fiduciary duties under state law** and under sections 36(a) and (b) of the Act, **that there is a reasonable likelihood that [the continuation of] the plan will benefit the company and its shareholders...** (emphasis added)

**There Is a Significant Prospect That the Trustee Defendants Will Be Adjudged**

---

[10]   Rule 12b-1(b)(2) requires approval by a vote of the board of directors "...cast in person at a meeting called for the purpose of voting on such plan or agreements..."

**Liable to the Fund for Breach of Their Fiduciary Duties by Voting to Continue the Fund's Plans and Agreements after the Fund Ceased Selling Shares to the Public**

It is undisputed that Trustees of the Fund caused the Fund, as of May 1, 2002, to cease offering and selling of shares of the Fund to the public. (Complaint, ¶28). While discovery will provide the Plaintiff and the Court with the specifics of the Trustees' reasons for closing the Fund to new investors, it is apparent that in making that decision the Trustees determined that the continued sales of shares of the Fund, and the resulting growth in the Fund's assets, would not benefit the Fund and its shareholders.[11]

The core of the claim in this case is that, in light of the fact that the Trustee Defendants determined, as of May 1, 2002, that it was no longer in the best interests of the Fund and its shareholders for the Fund to sell additional shares of the Fund to the public, the Trustee Defendants could not, "…in the exercise of their fiduciary duties under state law and under sections 36(a) and 36(b) of the [1940] Act…" have concluded "…that there is a reasonable likelihood that [the continuation of] the plan will benefit the [Fund] and its shareholders…" Rule 12b-1(e). Furthermore, the continuation of the Plan could not have been "... primarily intended to result in the sale of shares issued by [the Fund]." Rule 12b-1(a)(2).

Indeed, as alleged in the Complaint, **the Defendants have admitted in SEC filings that the continued payment by the Fund of the Rule 12b-1 fees, since the Fund closed to new investors on May 1, 2002, no longer served the purpose of increasing sales of the Fund's shares and no longer benefitted the Fund or its shareholders;**

---

[11]  No claim is asserted in this action with respect to the decision of the Trustees to close the fund to new investors.

**and that the continued payment of those fees only benefitted the Defendant Distributors**. (Complaint, ¶¶ 49 - 51).

The facts particularized in the Complaint more than adequately demonstrate the significant prospect that the Trustee Defendants will be adjudged liable to the Fund for breach of their fiduciary duties to the Fund and the Fund's shareholders by voting to continue the Fund's Plans and Agreements after the Fund ceased selling shares to the public. Accordingly, under the controlling standard established by the SJC in *Harhen*, demand was futile and is excused.

In arguing that demand was not futile here, the Defendants point to M.G.L. Ch. 182, Sec. 2B. That statute creates a presumption that if a trustee of a mutual fund is not an "interested person" under the 1940 Act, the trustee is disinterested in his or her actions as a trustee. From that the Defendants argue that Plaintiffs had to make demand because four of the Trustees were not "interested" under the 1940 Act. In fact, the detailed pleadings in the Complaint rebut any presumption of disinterestedness and more than adequately meet the criteria established by the SJC in *Harhen*, at 685 and fn. 5, for finding directors to be interested with respect to an action in which the directors are named as defendants.[12]

In *Scalisi v. Fund Asset Management, L.P., 380 F. 3d 133 (2nd Cir. 2004),* the Second Circuit recently held that a Maryland statute, Md. Code. Ann. Corps & Ass'ns § 2-

---

[12]    Without coming right out and saying so, the Defendants implicitly try to use M.G.L. Ch. 182, Sec. 2B, as if it required "universal demand" for derivative actions on behalf of mutual funds organized under Massachusetts law. The statute creates no such requirement. Of course, if the legislature had intended to require "universal demand" for derivative actions on behalf of mutual funds organized under Massachusetts law, it would have done so as it did, with respect to Massachusetts corporations, in M.G.L. Ch. 156D, §7.42.

405.3, which is virtually identical to M.G.L. Ch. 182, Sec. 2B, did not determine or even

modify the criteria for demand futility in Maryland, as established by the Maryland Supreme

Court in *Werbowsky v. Collomb,* 766 A 2d. 123 (Md. 2001).[13]  Specifically, the Second

Circuit held as follows:

> *Werbowsky* sets forth at length Maryland's standards for
> determining whether demand on a corporation's directors is
> excused.  We see no reason to believe that Maryland would
> depart from those standards in the case of a registered
> investment company [because of § 2-405.3 or the 1940 Act's
> definition of "interested"]....  We accordingly view the
> *Werbowsky* framework as governing and will use it to review
> the district court's determination that the Complaint fails to
> plead adequately that demand was excused by reason of
> futility.

*Id* at 140.

The Second Circuit's analysis and decision in *Scalisi* is precisely applicable to the

interplay of M.G.L. Ch. 182, Sec. 2B and the demand futility criteria established by the

Massachusetts Supreme Judicial Court in *Harhen*.  Just as *Werbowsky* governed the

federal court's demand futility analysis for a Maryland trust, the *SJC's Harhen* criteria

governs this Court's determination, under Massachusetts law, as to whether demand here

was futile and hence excused.

As demonstrated above, and in detail in the Complaint, a demand on the Trustee

Defendants to bring this action on behalf of the Fund would be a "useless...idle ceremony,"

*Harhen, supra* at 865, that would only serve to delay the orderly resolution of this action on

---

[13]    The relevant standard established in *Werbowsky* is that demand is futile and hence
excused if "...a majority of the directors are so personally and directly conflicted or committed to the
decision in dispute that they cannot reasonably be expected to respond to a demand in good faith
and within the ambit of the business judgment rule."  766 A. 2d at 144.

its merits.  The Defendants' motions to dismiss the fiduciary duty claims against them, because the Plaintiff did not make demand on the Trustees, should be denied.

## NASD RULE 2830 DOES NOT PREDETERMINE THAT THE RULE 12b-1 DISTRIBUTION FEES ARE NOT EXCESSIVE UNDER ALL OF THE CIRCUMSTANCES AND DOES NOT REGULATE OR GOVERN THE CONDUCT OF THE TRUSTEE DEFENDANTS IN ANY WAY

The Rule 12b-1 distribution fees which the Fund pays the Defendant each year are between .25% and 1.0% of the assets of the Fund.  The Defendant Distributors argues that Plaintiff's Sec 36(b) claim against it should be dismissed because that percentage is equal to, and not greater than, the 1.0% maximum  annual percentage which an underwriter can collect from a mutual fund for Rule 12b-1 distribution fees, pursuant to NASD Rule 2830. Essentially the Defendant Distributor asks this Court to hold, as a matter of law, regardless of the other relevant facts, that if a Rule 12b-1 Distribution Fee is not greater than the maximum permitted by NASD Rule 2830, the fee is *per se* reasonable under Sec. 36(b). The Defendant Distributor cites no authority for such a proposition, because no Court has ever so held.

In *Pfeiffer v. Bjurman Barry & Associates,* 2004 W.L. 1903075  (S.D.N.Y., August 24, 2004), a copy of which is attached hereto as Exhibit B,  the United States District Court for the Southern District of New York rejected the precise argument advanced by Distributors here.  As here, at issue in *Pfeiffer* were Rule 12b-1 fees being paid by a mutual fund that had closed to new investors.  The plaintiff claimed the fees were excessive, in violation of Sec. 36(b).  The Defendants moved to dismiss the complaint, arguing, as the Defendants do here, that, as a matter of law, the fees could not be excessive because they

were not greater than the maximum percentage of assets permitted by NASD Rule 2830. The Court in *Pfeiffer* rejected that argument and denied the motion to dismiss, holding as follows:

> ...The defendants heavily rely on the argument that, because the Plan caps its Rule 12b-1 fees at 0.25% of the Fund's average daily assets – or one-fourth less than the maximum asset – based charge allowed by the SEC [and the NASD] – the fees are *per se* reasonable. The defendants cite no case law for this proposition. Should the plaintiff succeed in showing that the fees were excessive...the defendant will not be able to defeat that showing by arguing that they could have charged even more....

*Id.* at *5.

In their Memorandum, at 4-5, the Defendants Lippman and Distributors assert that: "No claim is made (nor could it be made) that the Fund in this case was barred, while closed to new investors, from paying the Rule 12b-1 fees here. Rule 2830, as amended by Notice to Members 93-12, expressly permits such payments." The Defendants misstate both the claims made by plaintiff and the reach of the NASD and its Rule 2830. Plaintiff absolutely does claim here that the fiduciary duties of the Trustee Defendants and Distributors barred the Trustee Defendants from allowing the Fund to pay, and barred Distributors from receiving from the Fund, the Rule 12b-1 fees after the Fund was closed to new investors. The NASD cannot "permit" (or for that matter prohibit) any conduct by the Fund or any person or entity which is not a member of the NASD.[14] Indeed, Rule 2830(a) expressly provides that: "This Rule shall apply <u>exclusively</u> to the activities of

---

[14]    The NASD is a "private non-profit corporation...authorized to regulate itself by prohibiting and preventing fraud and unethical conduct by its members...much as would any association of professionals seeking to better itself and instill confidence in the public." <u>Jones v. Sec. & Exchange Comm'n</u>, 115 F.3d 1173, 1182 (4th Cir. 1997).

members ..." (emphasis added). Neither the Fund nor the Trustee Defendants are members of the NASD. "Question # 6" and the answer thereto notwithstanding, the NASD has no role whatsoever in determining whether or when the Fund here, or any mutual fund, may pay or must stop paying Rule 12b-1 fees.

No claim is made in this case that the Defendant Distributors is violating NASD Rule 2830. That rule sets a ceiling of 1.0% of the assets, per year, on the amount that can be charged for Rule 12b-1 distribution fees, only if all of the requirements and restrictions of Rule 12b-1 have been met. As the Court in *Pfeiffer* held, compliance with NASD Rule 2830 does not, in any way, mean that a mutual fund, its trustees or its underwriter, have met their fiduciary and other obligations under Rule 12b-1 and Sec. 36(b) of the 1940 Act. The fact that the Rule 12b-1 distribution fees paid to the Defendant here does not exceed the maximum allowed by NASD Rule 2830 does not speak at all to the question of whether – in light of the trustees' determination that as of May 1, 2002, it was no longer in the best interests of the Fund and its shareholders for the Fund to sell additional shares of the Fund to the public – it is a breach of the Defendant Distributors' fiduciary duties under Sec. 36(b) to continue to collect Rule 12b-1 distribution fees because they are not for activities which are **"primarily intended to result in the sale of shares issued by [the Fund]."** Rule 12b-1(a)(2).

## CONCLUSION

For all of the factual and legal reasons set forth herein and in the accompanying Alappat Declaration, the Defendants' Motions to Dismiss should be denied, *in toto.*

Dated: October 4, 2004

28

Respectfully submitted by the attorneys for the Plaintiff,

 /s/ Edward F. Haber

Edward F. Haber BBO No. 215620

Theodore M. Hess-Mahan BBO No. 557109

Shapiro Haber & Urmy LLP

Exchange Street

53 State Street

Boston, MA 02109

(617) 439-3939

**OF COUNSEL:**

Robert C. Schubert, Esq. (BBO No. 362242)

Juden Justice Reed, Esq.

Schubert & Reed LLP

Two Embarcadero Center, Suite 1600

San Francisco, CA 94111

(415) 788-4220