*SUPPLEMENTAL ADDENDUM I*



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

THE CHAIRMAN

August 19, 1993

The Honorable John D. Dingell
Chairman
Committee on Energy and Commerce
U.S. House of Representatives
2125 Rayburn House Office Building
Washington, DC 20515

    Re: Certain Rule 12b-1 Practices

Dear Chairman Dingell:

    I am responding to your letter of July 21, 1993 to then Acting Chairman Schapiro, regarding rule 12b-1 fees imposed by mutual funds. You point to a recent *Forbes* article raising concerns about certain rule 12b-1 fee practices. You have asked for a report on what action the Commission has taken or intends to take regarding such practices.

    The enclosed memorandum of the Division of Investment Management analyzes the application of rule 12b-1 to the two practices described in the article, and concludes that neither of them necessarily violates the current requirements of rule 12b-1. The memorandum notes, however, that the practices have been addressed by the National Association of Securities Dealers, Inc. ("NASD"). Specifically, the NASD Rules of Fair Practice place limits on mutual fund sales charges; under these limits, a fund that closes to new investors eventually must reduce or eliminate its asset-based sales charge. Also, the NASD Board of Governors has expressly permitted commission payments by brokerage firms to the estates of deceased sales representatives, provided that certain conditions are met. The memorandum indicates that the Division intends to re-examine rule 12b-1 and the NASD rules to determine whether changes are necessary to prevent possible abuses arising from these practices.

    I can assure you that the Commission has given and will give close attention to the regulation of rule 12b-1 fees. Last year, the Commission approved changes to the NASD Rules of Fair Practice to limit rule 12b-1 fees under the NASD's maximum sales charge rule. In the future, I expect the Commission to continue to monitor industry practices under the rule, and to consider rule changes if warranted.

    Please call me or Barbara J. Green, Deputy Director of the Division of Investment Management, (202) 272-2045, if you have any further questions.

Sincerely,

Arthur Levitt
Chairman

Enclosure

MEMORANDUM

August 16, 1993

To:      Chairman Levitt

From:    Barbara J. Green, Deputy Director
         Division of Investment Management

Subject: Chairman Dingell's Inquiry Concerning Rule 12b-1 Fees

## I. Introduction

Chairman Dingell has requested a report on two practices involving rule 12b-1 fees[1] described in an article appearing in the July 19, 1993 issue of *Forbes*. First, some funds that are closed to new investors continue to assess 12b-1 fees. Second, a fund sales representative has arranged with his business partner that, upon his death, and in exchange for the assignment of his customer accounts to the business partner, his estate will continue to collect 12b-1 servicing fees on shares he sold prior to his death. Specifically, Chairman Dingell has asked how the Commission is monitoring this area, and whether the Commission is addressing, or intends to address, these practices through enforcement action or revisions to rule 12b-1.

The Division believes that neither of the practices described in the article necessarily violates rule 12b-1. Both practices, however, are directly addressed by the rules and policies of the National Association of Securities Dealers, Inc. ("NASD"). The NASD's maximum sales charge rule ultimately would require a fund that made no new sales to reduce or eliminate its asset-based sales charge. Also, the NASD Board of Governors has expressly permitted the payments of sales commissions to the estates of deceased sales representatives, provided that certain conditions are met.

The Division intends to re-examine rule 12b-1 as recommended in the *Protecting Investors* report.[2] In re-examining the rule, the Division will give careful consideration to the practices described in the article. The Division also will discuss these practices with the NASD.

Finally, the *Forbes* article states that, because fund expense ratios have increased since 1980, it is a "farce" to suggest that increases in fund assets lower fund expenses per share. The Division continues to believe, as it stated in its memorandum of April 9, 1992 to former Chairman Breeden, that such reports do not accurately analyze changes in fund expense ratios because they fail to account for the decrease in front-end sales loads during

---

[1] Rule 12b-1 under the Investment Company Act of 1940 permits mutual funds to use their assets to finance the distribution of their shares. 17 C.F.R. § 270.12b-1. See Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414 (Oct. 28, 1980), 45 FR 73898 (adopting release).

[2] SEC DIVISION OF INVESTMENT MANAGEMENT, PROTECTING INVESTORS: A HALF CENTURY OF INVESTMENT COMPANY REGULATION, 326-328 (1992). The report recommended that the Commission adopt certain amendments to rule 12b-1, consistent with the amendments to the NASD sales charge rule and with "spread load" plans, which, in effect, spread the payment of sales commissions over several years.

2

the past decade, which has offset much, if not all, of the increase in fund expense ratios.[3] Such reports also fail to account for industry expansion into global markets and for new shareholder services, such as sweep accounts, and telephone redemption and exchange privileges, which may have offset expense reductions resulting from increased fund assets.[4]

## II. Discussion

### A. Monitoring

The Division monitors the operation of rule 12b-1 plans principally through its Office of Inspections, which, together with the inspections staff of the Commission's Regional Offices, examines individual funds for compliance with rule 12b-1. The Division also monitors rule 12b-1 plans through its Office of Disclosure, which reviews mutual fund registration statements, and through its Office of Financial Analysis, which monitors mutual fund fees generally and rule 12b-1 fees specifically. In addition, the Division of Market Regulation monitors broker-dealer compliance with rule 12b-1 through its supervision of the NASD's broker-dealer inspection program. Violations of rule 12b-1 and other abusive fee practices may be uncovered by any of these offices. The Commission has brought enforcement actions as a result of violations uncovered in the course of monitoring these plans.[5]

### B. Requirements of Rule 12b-1

Fee practices such as those described in the Forbes article generally are governed by rule 12b-1 under the Investment Company Act, which permits the use of fund assets to promote distribution. Rule 12b-1 requires fund directors, including a majority of the independent directors, to determine that the use of fund assets to promote distribution is reasonably likely to benefit fund shareholders. The rule also contains provisions intended to ensure that the directors are not dominated or unduly influenced by management and that they are fully informed and exercise reasonable business judgment. Rule 12b-1, however, does not provide the board with a checklist of information it must review. Instead, rule 12b-1(d) requires the board to request such information as may be reasonably necessary to make an informed determination. Thus, the board's review under rule 12b-1 will depend on the specific facts and circumstances relating to each fund's 12b-1 plan.

### C. Imposition of Asset-Based Sales Charges by Funds that are Closed to New Investors

Rule 12b-1 permits a fund to spread its distribution expenses over several years and

---

[3] See Letter dated April 15, 1992 from former Chairman Breeden to Chairman John D. Dingell enclosing Memorandum dated April 9, 1992, to former Chairman Breeden from The Division of Investment Management regarding Chairman Dingell's Inquiry Concerning Mutual Fund Fees (offset created by decline in front-end loads is not reflected in expense ratio because 12b-1 fees are annual fund expenses that must be included in a fund's expense ratio while front-end sales loads are not). (Letter and Memorandum attached as Appendix A.)

[4] See Memorandum, supra note 3, at 2.

[5] See Condensed Equities Corp. of America, Admin. Proc. File No. 3-7057 (Sept. 19, 1988), and Carey Fund Management, Inc., Admin. Proc. File No. 3-7056 (Sept. 19, 1988).

allows payment of fees for past distribution services. Therefore, even if a fund closes to new investors, it may continue to pay rule 12b-1 fees in order to compensate the distributor for its past distribution efforts. In 1988, the Commission proposed extensive amendments to rule 12b-1 that would have, among other things, greatly limited the use of 12b-1 fees to pay for past distribution expenses.[6] In response to the Commission's proposal, and industry opposition to it, the NASD explored whether it could regulate 12b-1 fees under its rule limiting sales loads. The NASD concluded that it could, and amended the rule to cover 12b-1 fees. The amendment was approved by the Commission in July, 1992; it became effective in July of this year.[7] The Commission has not taken further action on its 1988 proposal.

The NASD maximum sales charge rule limits payment of 12b-1 fees in two respects.[8] First, the rule prohibits NASD members from offering or selling the shares of a mutual fund that has total sales charges (including front-end and deferred sales loads and asset-based sales charges) in excess of a specified percentage of the fund's total sales, ranging from 6.5% to 8.5%. This percentage is a rolling cap based on the fund's new gross sales; combined front-end, asset-based, and deferred sales charges may not exceed the rolling cap. Second, the rule prohibits members from offering or selling the shares of a mutual fund if the fund pays more than 1% of its average annual net assets per year in asset-based sales charges (including certain asset-based service charges).

When a fund closes to new investors, it may continue to pay asset-based distribution fees until the total fees paid reach the rolling cap. If the fund does not make new sales, the fund eventually will reach its cap under the rule and must reduce or eliminate its 12b-1 fee. The Division believes that the NASD maximum sales charge rule will deter excessive 12b-1 sales charges, but the Division intends to monitor closely the operation of the rule to see how it affects industry practices.

D. Payment of Trail Commissions to the Estates of Sales Representatives

The *Forbes* article describes an arrangement to pay "12b-1 servicing fees" (also known as "trail commissions") to the estate of a deceased sales representative. Trail commissions are relatively commonplace in mutual fund fee structures. Funds generally use them to compensate broker-dealers for services such as responding to shareholders' inquiries concerning yields, exchange privileges, redemption rights, shareholder account balances, and other matters. Trail commissions also may provide incentives for continued broker promotion of the fund to minimize shareholder redemptions. Finally, funds may use trail commissions to spread sales compensation over time. Trail commissions often serve more than one of these purposes.

---

[6] Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431 (June 10, 1988), 53 FR 23258.

[7] Order Approving Proposed Rule Change Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, Securities Exchange Act Release No. 30897 (July 7, 1992) 57 FR 30985.

[8] NASD Rules of Fair Practice, Article III, section 26. Authority to establish maximum sales charges for investment company securities is delegated to the NASD by section 15A of the Securities Exchange Act of 1934 [15 USC 78o-3] and section 22(b) of the Investment Company Act [15 USC 80a-22(b)].

4

Trail commissions typically are paid under a distribution agreement between a fund's distributor (principal underwriter) and a broker-dealer firm. This agreement covers, among other matters, the way in which the distributor will compensate the broker-dealer for selling fund shares and for providing other services. For a fund with a rule 12b-1 plan, the agreement typically specifies the percentage of gross sales the distributor will pay to the broker-dealer firm as an up-front lump sum at the time of sale, and any ongoing trail commission (which is determined as a percentage of the average daily value of the fund shares that the broker-dealer's customers hold). A fund, through its distributor, continues paying trail commissions to a broker-dealer firm based on the aggregate fund assets held by customers of that broker-dealer so long as the agreement between the broker-dealer and the distributor remains in effect.

The distribution agreement usually does not specify the percentage the broker-dealer firm would pay to its registered representatives out of any up-front or ongoing payment to the broker-dealer firm. Rather, the broker-dealer firm has employment agreements with its registered representatives that specify how much of the payments received by the firm will be credited to the representatives. Practices vary from firm to firm, and often even within firms depending upon the deal negotiated by an individual representative.

Thus, it is a broker-dealer's internal compensation policies that govern the treatment of trail commissions (and other types of continuing commission payments) when a representative leaves the firm, retires, or dies. The firm may treat a representative's clientele as "house" accounts; in that case, the firm itself may keep most or all of the trail commissions paid by a fund on fund shares held by that representative's former clients. More typically, the firm assigns the representative's clients to another representative in the firm; this new representative would receive a portion of the trail commissions and be expected to provide services to the clients of the former representative. Because the cost of finding new clients is high, most broker-dealer firms are interested in continuing to provide service to the clients of the former representative so that they will continue as clients of the firm. (Of course, if a client leaves the firm, the firm will no longer be able to realize trail commissions on the shares of the fund owned by the client.)

For the same reason, a representative may agree to take over servicing another representative's clientele if that representative dies, while paying over to the other representative's beneficiaries or estate trail commissions for sales made before that other representative's death. In exchange for foregoing those prior trail commissions, the representative acquires a client base that it could otherwise take substantial effort and time to develop.

1. Application of Rule 12b-1

Where a trail commission arrangement is subject to rule 12b-1, the board has responsibilities under the rule to take certain actions with respect to that arrangement as part of the fund's 12b-1 plan.⁸ Rule 12b-1(c) requires the board to determine that a plan to use fund assets for distribution creates a reasonable likelihood of benefit for fund shareholders, and rule 12b-1(d) requires the board to request and evaluate any information that is

---

⁸ Whether particular shareholder or other services are "primarily intended to result in the sale of fund shares" and, therefore, must be paid under a 12b-1 plan, will depend on the surrounding circumstances. See Inv. Co. Act Rel. 16431, supra note 6, at n.126.

5

reasonably necessary to make that determination. Fund directors should ensure that the amounts paid by the fund for distribution are reasonable in light of the distribution services that have been purchased or performed.[10]

Rule 12b-1 thus primarily specifies procedures that the board must follow in approving the adoption or continuation of a rule 12b-1 plan. Neither the rule nor any Commission pronouncement concerning rule 12b-1 as now in effect requires a conclusion that payments to a broker-dealer firm with a compensation arrangement such as that described in the Forbes article would necessarily violate rule 12b-1.[11] Nor does any such authority indicate that a fund board must review all internal compensation arrangements of all broker-dealer firms with which the fund's distributor has distribution agreements or take any specific action in response to information obtained about such arrangements.

This compensation arrangement highlights the more general question whether the payment of such trail commissions under rule 12b-1 plans always is appropriate or actually benefits funds and their shareholders. The Commission's 1988 proposal sought, among other things, to clarify and enhance rule 12b-1's standards for evaluating distribution plans. The Division expects to recommend changes to rule 12b-1 that address those concerns. In developing that recommendation, the Division will give careful consideration to the practices described in the Forbes article.

2.   NASD Policy on Payments to Estates

Compensation arrangements between sales representatives such as those in the Forbes article are subject to more specific regulation under the NASD rules.[12] NASD policy expressly permits a registered representative to arrange for another registered representative to take over and service his customer accounts and to pay him or his beneficiary continuing commissions generated on such accounts, provided that a *bona fide* contract calls for such payments, and provided that such payments conform to applicable law or regulations.[13] The Division intends to discuss the background and application of this policy with the NASD staff.

---

[10] Inv. Co. Act Rel. 16431, supra note 6, at a.60.

[11] There is nothing in the Forbes article to suggest that the brokerage firm described in the article would not continue to assure that its representatives provided the services for which the firm was receiving compensation pursuant to the rule 12b-1 plan. Thus, it does not necessarily follow, as the article implies, that the arrangement would not meet the requirements of rule 12b-1.

[12] Authority to regulate the relationship between brokers and their sales representatives is delegated to the NASD by section 15A of the Securities Exchange Act.

[13] NASD MANUAL (CCH) ¶ 5268 (policy of the Board of Governors of the NASD).