*SUPPLEMENTAL ADDENDUM  K*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
                                 :
MILTON PFEIFFER,                 :
                                 :
            Plaintiff,           :        03 CV 9741 (VM)
                                 :
      v.                         :
                                 :
BJURMAN, BARRY & ASSOCIATES, G.  :
ANDREW BJURMAN, O. THOMAS BARRY  :
III, JOSEPH E. MAIOLO, MARK J.   :
MASON, and WILLIAM WALLACE,      :
                                 :
            Defendants,          :
                                 :
BJURMAN, BARRY MICRO CAP GROWTH  :
FUND,                            :
                                 :
            Nominal Defendant.   :
- - - - - - - - - - - - - - - - x


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue – 47th Floor
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Attorneys for Defendants


March 25, 2004

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................... 1

STATEMENT OF FACTS ............................................ 2

    A.    The Trust, Investment Adviser, and
           Board of Trustees ................................... 2

    B.    The Distribution Plan ............................. 4

    C.    The Micro-Cap Growth Fund ......................... 6

    D.    Plaintiff's Suit in this Court ...................... 7

ARGUMENT ..................................................... 8

I.    THE COMPLAINT STATES NO CLAIM UNDER ICA § 36(b) .......... 8

    A.    Applicable Statutory Law:  ICA §§ 12(b) and 36(b) .... 8

          1.    Section 12(b) of the ICA and Rule 12b-1 ........ 9

          2.    Section 36(b) of the ICA ....................... 10

    B.    Plaintiff Fails to Plead Facts Demonstrating
           that the Fund's Rule 12b-1 Fee Bears No
           Reasonable Relationship to the Services Rendered .... 12

          1.    The Complaint Alleges No Facts Addressing the
                Relationship between the Fund's Rule 12b-1
                Expenses and the Services Rendered ............ 14

          2.    The Disinterested Trustees' Continued Approval
                of the Plan Provides a Separate Ground for
                Dismissal ..................................... 19

II.    THE COMPLAINT STATES NO CLAIM UNDER DELAWARE STATE LAW ... 23

    A.    Plaintiff's State Law Claims Should Be
           Dismissed for Failure to Make Demand on the
            Board of Trustees ................................... 23

i

**TABLE OF CONTENTS**
[Continued]

<u>Page</u>

B.    The Complaint Fails to State a Claim under
      Delaware Law for Breach of Fiduciary Duties or
      Corporate Waste ................................... 26

CONCLUSION ................................................ 28

## TABLE OF AUTHORITIES

Page(s)

### Cases

Aronson v. Lewis,
    473 A.2d 805 (Del. 1984) ...........................24, 25, 26

Bildstein v. Dreyfus/Laurel Funds, Inc.,
    No. 97 Civ. 8919 (DC), Fed. Sec. L. Rep. ¶ 90,473,
    1999 WL 177349 (S.D.N.Y. Mar. 30, 1999) .....................21

Brehm v. Eisner,
    746 A.2d 244 (Del. 2000) ..........................24, 27, 28

Burks v. Lasker,
    441 U.S. 471 (1979) .........................................8

Cede & Co. v. Technicolor, Inc.,
    634 A.2d 345 (Del. 1993) ...............................25, 26

Cinerama, Inc. v. Technicolor, Inc.,
    663 A.2d 1156 (Del. 1995) ..................................27

Daily Income Fund, Inc. v. Fox,
    464 U.S. 523 (1984) ........................................11

Faulkner v. Verizon Communications, Inc.,
    189 F. Supp. 2d 161 (S.D.N.Y. 2002) .........................3

Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,
    694 F.2d 923 (2d Cir. 1982) .......................11, 12, 14

Glazer v. Zapata Corp.,
    658 A.2d 176 (Del. Ch. 1993) ..............................27

Grandon v. Merill Lynch & Co.,
    147 F.3d 184 (2d Cir. 1998) ................................8

Green v. Nuveen Advisory Corp.,
    295 F.3d 738 (7th Cir. 2002) .............................9, 20

H-M Wexford LLC v. Encorp, Inc.,
    2003 WL 21254843 (Del. Ch. May 27, 2003) ..................25

TABLE OF AUTHORITIES
[Continued]

Page(s)

In re Livent, Inc. N'holders Sec. Litig.,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) ......................... 8

In re Nat'l Auto Credit, Inc. S'holders Litig.,
  No. Civ.A.19028, 2003 WL 139768 (Del. Ch. Jan. 10, 2003) .... 27

In re The Limited, Inc. S'holders Litig.,
  2002 WL 537692 (Del. Ch. Mar. 27, 2002) ..................... 28

Kalish v. Franklin Advisers, Inc.,
  928 F.2d 590 (2d Cir. 1991) ............................. 11, 20

King v. Douglass,
  973 F. Supp. 707 (S.D. Tex. 1996) .......................... 16

Kramer v. Time Warner Inc.,
  937 F.2d 767 (2d Cir. 1991) ................................. 3

Krantz v. Prudential Inv. Fund Mgmt. LLC,
  305 F.3d 140 (3d Cir. 2002) ............................. 16, 22

Krinsk v. Fund Asset Mgmt., Inc.,
  715 F. Supp. 472 (S.D.N.Y. 1988),
  aff'd, 875 F.2d 404 (2d Cir. 1989) ...................... 18, 20

Krinsk v. Fund Asset Mgmt., Inc.,
  875 F.2d 404 (2d Cir. 1989) ................................ 10

Leeds v. Meltz,
  85 F.3d 51 (2d Cir. 1996) .................................. 21

Levine v. Smith,
  591 A.2d 194 (Del. 1991) ................................... 25

Levy v. Alliance Capital Mgmt. L.P.,
  No. 97 Civ. 4672 (DC), 1998 WL 744005 (S.D.N.Y.
  Oct. 26, 1998), aff'd, 189 F.3d 461 (2d Cir. 1999) .. 13, 14, 16

Malpiede v. Towson,
  780 A.2d 1075 (Del. 2001) .................................. 25

Migdal v. Rowe Price-Fleming Int'l Inc.,
  248 F.3d 321 (4th Cir. 2001) ......................... 14, 16, 22

# TABLE OF AUTHORITIES
## [Continued]

Page(s)

Olesh v. Dreyfus Corp.,
  Fed. Sec. L. Rep. ¶ 98,907,
  1995 WL 500491 (E.D.N.Y. Aug. 8, 1995) ..................... 23

Preston v. New York,
  223 F. Supp. 2d 452 (S.D.N.Y. 2002) ......................... 3

Schuyt v. Rowe Price Prime Reserve Fund, Inc.,
  663 F. Supp. 962 (S.D.N.Y.),
  aff'd, 835 F.2d 45 (2d Cir. 1987) .......................... 12

Strougo v. Scudder, Stevens & Clark, Inc.,
  964 F. Supp. 785 (S.D.N.Y. 1997) .......................... 16

Tannenbaum v. Zeller,
  552 F.2d 402 (2d Cir. 1977) ............................... 23

Verkouteren v. Blackrock Fin. Mgmt., Inc.,
  37 F. Supp. 2d 256 (S.D.N.Y. 1999) ........................ 22

Wexler v. Equitable Capital Mgmt. Corp.,
  No. 93 Civ. 3834 (RPP), 1994 WL 48807
  (S.D.N.Y. Feb. 17, 1994) .................................. 13

White v. Panic,
  793 A.2d 356 (Del. Ch. 2000) ............................... 24

## Statutes

15 U.S.C. § 801-1 (2000) ...................................... 3

15 U.S.C. § 80a-10(a) (2000) .................................. 9

15 U.S.C. § 80a-12(b) (2000) .................................. 9

15 U.S.C. § 80a-2(19)(A) (2000) ............................... 9

15 U.S.C. § 80a-2(a)(19)(A) (2000) ............................ 9

15 U.S.C. § 80a-2(a)(6) (2000) ............................... 22

15 U.S.C. § 80a-2(a)(9) (2000) ............................... 22

15 U.S.C. § 80a-35(b) (2000) ............................. passim

15 U.S.C. § 80a-35(b)(1) (2000) .............................. 11

TABLE OF AUTHORITIES
[Continued]

Page(s)

15 U.S.C. § 80a-35(b)(3) (2000) ................................ 11

### Regulations

17 C.F.R. § 270.12b-1 (2004) .................................... 9

17 C.F.R. § 270.12b-1(b) (2004) ........................... 10, 21

17 C.F.R. § 270.12b-1(c) (2004) ............................... 10

17 C.F.R. § 270.12b-1(e) (2004) ............................... 10

### Rules

Del. Ct. Ch. R. 23.1 ........................... 1, 8, 23, 24

Fed. R. Evid. 201 .................................................. 3

Fed. R. Civ. P. 12(b)(6) ...................... 1, 3, 8, 26

SEC Rule 12b-1 . . . . . . . . . . . . . . . . . . . . . . _passim_

### Other Authorities

Investment Company Amendments Act of 1970, S. Rep.
  No. 91-184 (1969), _reprinted_ _in_ 1970 U.S.C.C.A.N.
  4897 ...................................................... 12, 20

Memorandum, "Chairman Dingell's Inquiry Concerning
  Rule 12b-1 Fees," Barbara J. Green, Deputy Director,
  SEC Div. of Inv. Mgmt., dated Aug. 16, 1993 ................. 18

Rochelle Kauffman & Diane E. Ambler, The Financing of
  Mutual Fund "B Share" Arrangements, 52 Bus. Law. 1385
  (Aug. 1997) ................................................. 19

SEC No-Action Letter, 1989 WL 246220 (June 20, 1989) .......... 17

Defendants Bjurman, Barry & Associates ("BB&A"),
G. Andrew Bjurman, O. Thomas Barry III, Joseph E. Maiolo,
Mark J. Mason and William Wallace, and nominal defendant
Bjurman, Barry Micro-Cap Growth Fund (the "Fund" or "Micro-Cap
Growth Fund"), respectfully submit this memorandum of law in
support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6)
and Del. Ct. Ch. R. 23.1, to dismiss with prejudice plaintiff's
First Amended Complaint (the "Complaint").

## PRELIMINARY STATEMENT

Defendants here are the investment adviser and
trustees of a mutual fund -- the Micro-Cap Growth Fund, one of
the best-performing and most highly-regarded funds nationwide --
that last year was closed to investors previously unconnected
with the Fund.  Plaintiff alleges that the Fund's closing
requires defendants to terminate the Fund's Distribution Plan
pursuant to SEC Rule 12b-1, which permits a mutual fund to set
aside a portion of its assets to cover expenses in connection
with the distribution and marketing of fund shares.

Services covered by such expenses include payments to
broker-dealers to service shareholder accounts on an ongoing
basis, to provide compensation for prior sales and marketing
efforts, and to maintain their customers' accounts with the
mutual fund.  Even though all such services continue past the
Fund's closure to new investors, plaintiff alleges that the
investment adviser has breached its fiduciary duty with respect

to the receipt of compensation under section 36(b) of the Investment Company Act of 1940, and that all defendants have breached their fiduciary duties under Delaware state law.

To state a claim for relief, however, plaintiff must allege that the Fund's Rule 12b-1 expenses are so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining. This he does not -- and cannot -- do. The Complaint alleges nothing about the nature and quality of the services rendered now that the Fund is closed, or their relationship to the current expenses. Instead, plaintiff relies exclusively on conclusions of law, without providing any factual basis for his claim. His cookie-cutter pleading warrants dismissal with prejudice.

## STATEMENT OF FACTS

**A.    The Trust, Investment Adviser, and Board of Trustees**

The Bjurman, Barry Funds ("Trust") is a diversified, open-end, investment company organized as a Delaware business trust. ¶ 12; Statement of Additional Information of The Bjurman, Barry Funds (filed with the SEC, Aug. 1, 2003) ("SAI") at 3 (Ex. B).[1]  The Trust is a registered investment company

---

[1] References in the form "¶ __" are to the Complaint, and those in the form "(Ex. __)" are to Exhibits to the Declaration of Mitchell A. Karlan, dated March 25, 2004.  In considering a motion to dismiss a complaint, "[a] court may consider
[Footnote continued on next page]

under the Investment Company Act of 1940 ("ICA"), 15 U.S.C.

§§ 801-1 et seq., that offers shares in three mutual funds:  the

Micro-Cap Growth Fund, the Small Cap Growth Fund, and the All

Cap Growth Fund.  Prospectus of The Bjurman, Barry Funds (filed

with the SEC, Aug. 1, 2003) ("Prospectus") (Ex. C) at 1-2.

BB&A -- as investment adviser for these funds --

determines which securities each fund shall buy or sell, and,

together with the Trust's officers, administers the funds' daily

operations.  See ¶¶ 9, 14; SAI (Ex. B) at 12.  BB&A thus makes

the investment decisions concerning the funds' assets and

administers the funds' investments, subject to the supervision

of, and policies established by, the trustees of the Trust.

Prospectus (Ex. C) at 10.  Bjurman is BB&A's President and CEO,

and Barry serves as BB&A's Senior Executive Vice President and

Chief Investment Officer.  See ¶ 19(c).  For providing

investment advisory services, each fund pays BB&A a monthly fee

---

[Footnote continued from previous page]
documents attached as an exhibit thereto or incorporated by
reference, as well as any documents that are integral to, or
explicitly referenced in, the pleading.  In addition, a Court
may consider 'matters of which judicial notice may be taken.'"
Preston v. New York, 223 F. Supp. 2d 452, 461 (S.D.N.Y. 2002)
(Marrero, D.J.) (citations omitted); see also Kramer v. Time
Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial
notice on Rule 12(b)(6) motion of public documents filed with
SEC and noting that "it is highly impractical and inconsistent
with Federal Rule of Evidence 201 to preclude a district court
from considering such documents when faced with a motion to
dismiss"); Faulkner v. Verizon Communications, Inc., 189 F.
Supp. 2d 161, 168 (S.D.N.Y. 2002) (on motion to dismiss,
taking judicial notice under Fed. R. Evid. 201 of reports
filed pursuant to SEC regulations).

that is calculated daily by applying an annual rate to the

applicable fund's average daily net assets.  Prospectus (Ex. C)

at 10.  That fee is not the subject of this action.

The Board of Trustees (the "Board") establishes the

funds' policies, and supervises and reviews BB&A's management of

the funds.  Id. at 9.  The Board consists of two "interested"

trustees affiliated with BB&A -- Bjurman and Barry, who share

the presidency of the Trust -- and three "disinterested"

trustees with no affiliation to, or financial interest in, BB&A:

Maiolo, Mason and Wallace.  See ¶ 13; SAI (Ex. B) at 12-15.

## B.   The Distribution Plan

The Board has adopted a Distribution Plan (the

"Distribution Plan" or "Plan") pursuant to SEC Rule 12b-1

promulgated under the ICA, which permits an investment company

to use fund assets to cover expenses incurred in connection with

selling and distributing shares of each fund.  The complete text

of the Plan was publicly filed with the SEC on August 1, 1999.

See Ex. 15 to Form N-1A of The Bjurman Funds (filed Aug. 1,

1999) (Ex. D); Form N-1A, Part C, Item 24(b)(15) (requiring that

any written plan pursuant to Rule 12b-1 be attached as Exhibit

15 to Form N-1A).  The Plan was approved by a majority of the

Board, including a majority of the independent trustees, who are

not interested persons in the Trust and who have no financial

interest in the Plan's operation.  Plan (Ex. D) at 1.  The Plan

also was approved by shareholder vote.  Id.

The Plan provides that each fund -- including the Micro-Cap Growth Fund -- will reimburse BB&A, the Distributor or others in an amount up to 0.25% of the fund's average daily net assets for expenses incurred in connection with promotion and distribution of its shares. See ¶¶ 2, 17; Plan (Ex. D) ¶¶ 1-2. These expenses include payments to financial institutions and intermediaries such as securities dealers ("broker-dealers") and banks who have sold shares of the fund, who furnish services to shareholders and who maintain shareholder accounts. Plan (Ex. D) ¶ 1. The Plan contemplates that the services of such financial institutions and intermediaries include:

- Aiding in maintaining the investment of their respective customers in each fund;

- Establishing and maintaining customer accounts and records;

- Monitoring dividend payments from the Trust on the behalf of customers;

- Arranging for bank wires;

- Receiving and answering correspondence; and

- Assisting with purchase and redemption requests.

Id. Also reimbursable under the Plan are expenses associated with preparation and mailing prospectuses and sales literature, and with obtaining information, analysis and reports needed for marketing and advertising promotions. Id.; ¶ 15.

The Plan must be re-approved annually by a vote of the Board, including the non-interested trustees, cast in person at

a meeting called for the purpose of voting on the Plan.  Plan (Ex. D) ¶ 4.  The Board must review at least quarterly a written report that itemizes the distribution-related expenses incurred on the funds' behalf and specifies the purpose for each expense. Id. ¶ 3.  BB&A and the Distributor also must provide such information as the Board reasonably may request to make an informed decision as to whether the Plan should be continued. Id.  The Complaint does not allege that the Board or BB&A failed properly to discharge any of these duties.

The Plan currently remains in effect with respect to all of the Trust's funds, including the Micro-Cap Growth Fund. ¶ 17.  For the fiscal year ended March 31, 2003, the Fund incurred expenses of $836,845 pursuant to the Distribution Plan. SAI (Ex. B) at 12; see also ¶ 9 (alleging that Fund's Rule 12b-1 expenses exceed $1.5 million annually).

C.    **The Micro-Cap Growth Fund**

The Micro-Cap Growth Fund targets for investment companies with market capitalizations generally between $30 million and $300 million.  Prospectus (Ex. C) at 2.  The Fund has been closed to new investors since May 30, 2003.  ¶ 17. On June 2, 2003, the Trust filed with the SEC a supplement to its August 1, 2002 prospectus ("Supplement" (Ex. E)).  This Supplement made clear that, although closed to new investors, the Fund remained open to additional investments by (1) existing Fund shareholders and (2) shareholders of other Trust funds --

specifically, the All Cap Growth Fund and the Small Cap Growth
Fund -- who wished to exchange into the Fund to open a new
account. Id. The Trust further advised that it reserved the
right to reopen the Fund after the closing date. Id.

**D.  Plaintiff's Suit in this Court**

On December 9, 2003, plaintiff filed this derivative
action against BB&A purportedly on behalf the Micro-Cap Growth
Fund.  Plaintiff alleged that, because the Micro-Cap Growth Fund
is now closed to new investors, its expenses pursuant to the
Distribution Plan are excessive in violation of federal and
state law.  Plaintiff charged that BB&A -- as an alleged
recipient of payments made pursuant to the Distribution Plan --
had violated its fiduciary duty under ICA § 36(b) with respect
to the receipt of compensation, and its fiduciary duties under
Delaware state law.  That same day, plaintiff filed a suit with
identical claims against the Dreyfus Corporation, see Pfeiffer
v. Dreyfus Corp., 03 CV 9740 (DLC) (filed Dec. 9, 2003, amended
Feb. 20, 2004), which remains pending before Judge Cote.

On February 20, 2004, plaintiff filed the First
Amended Complaint that is the subject of defendants' motion.
Plaintiff's new complaint, principally, (1) adds the Board of
Trustees as defendants with state law claims against them for
breach of fiduciary duties and waste of corporate assets; and
(2) alleges that plaintiff made no demand on the trustees to
file suit because such demand would be futile.  Defendants now

move to dismiss this action with prejudice, pursuant to Fed. R.

Civ. P. 12(b)(6) and Del. Ct. Ch. R. 23.1.

ARGUMENT

POINT I.

THE COMPLAINT STATES NO CLAIM UNDER ICA § 36(b)

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6),

the Court accepts as true only well-pleaded factual allegations.

Grandon v. Merill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).

"The court need not credit conclusory statements unsupported by

assertions of facts or legal conclusions and characterizations

presented as factual allegations." In re Livent, Inc. N'holders

Sec. Litig., 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (Marrero,

D.J.). Here, the Complaint offers only the conclusory assertion

that Rule 12b-1 expenses are unnecessary because the Fund is not

now marketing and selling shares to investors new to the Trust

-- without ever addressing the nature and quality of the

services actually currently provided to the Fund and its

shareholders, as expressly contemplated by the Plan and SEC

guidelines. The Complaint should be dismissed with prejudice.

A.    Applicable Statutory Law:  ICA §§ 12(b) and 36(b)

Through the ICA, Congress sought to resolve potential

conflicts of interest between a fund and its investment adviser

by placing unaffiliated trustees in the role of "independent

watchdogs" who look after shareholder interests. Burks v.

Lasker, 441 U.S. 471, 484-85 (1979). The ICA thus requires that

8

at least forty percent of a fund's directors be "disinterested" -- *i.e.*, independent of, and unaffiliated with, the investment adviser. See 15 U.S.C. §§ 80a-10(a), 80a-2(a)(19)(A) (2000). "These independent directors [are] directly accountable to shareholders and [are], among other duties, responsible for determining adviser compensation and approving, by majority, all agreements with advisers." Green v. Nuveen Advisory Corp., 295 F.3d 738, 742 (7th Cir. 2002) (citing 15 U.S.C. § 80a-15(c)).

### 1. Section 12(b) of the ICA and Rule 12b-1

Among those agreements requiring approval of a majority of independent directors is a fund's Distribution Plan pursuant to ICA § 12(b) and Rule 12b-1 promulgated thereunder, 17 C.F.R. § 270.12b-1 (2004). Rule 12b-1 permits a mutual fund, under specified circumstances, to use fund assets to cover expenses in connection with marketing and distributing its shares, such as compensation to brokers for assisting purchasers of fund shares. 17 C.F.R. § 270.12b-1(b); 15 U.S.C. § 80a-12(b) (2000) (authorizing SEC to prescribe rules under which mutual fund may bear expenses in connection with share distribution).

Under Rule 12b-1, a mutual fund must have a written plan -- the "Distribution Plan" or "12b-1 Plan" -- that describes all material aspects of the financing of distribution of fund shares, particularly the fee charged to the fund. 17 C.F.R. § 270.12b-1(b). Rule 12b-1 imposes strict requirements

for both initial approval and continued renewal of a fund's Distribution Plan.  Among other things, the 12b-1 Plan must be:

- Approved by a majority of the fund's directors, including a majority of "disinterested" directors who have no direct or indirect financial interest in the plan;

- Approved by a majority of the outstanding voting securities;

- Renewed annually by the fund's board, including a majority of the "disinterested" directors; and

- Reviewed quarterly by the board, who must receive at least quarterly written reports showing amounts expended under the plan and purposes of the expenditures.

See 17 C.F.R. § 270.12b-1(b), (c).  Additionally, approving directors must find "a reasonable likelihood that the plan will benefit the [fund] and its shareholders."  17 C.F.R. § 270.12b-1(e).  This conclusion must be "in the exercise of reasonable judgment and in light of their fiduciary duties under state law and under Section 36(a) and (b) of the [ICA]."  Id.

   2.   **Section 36(b) of the ICA**

        Any action, as here, alleging that Rule 12b-1 expenses result in excessive compensation to a fund's investment adviser or its affiliates must be brought under ICA § 36(b).  Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 406, 412 (2d Cir. 1989) (holding that there is no private right of action under ICA § 12(b) when claim is indistinguishable from § 36(b) claim).

        Section 36(b) imposes a fiduciary duty on a mutual fund's investment adviser "with respect to the receipt of

10

compensation." 15 U.S.C. § 80a-35(b) (2000). This statute creates a private cause of action that may be brought by an individual shareholder on behalf of a mutual fund for breach of fiduciary duty arising out of excessive compensation to the investment adviser. Id.

The Supreme Court has termed ICA § 36(b) an "unusual" statute that creates a "unique" right. Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 535-36 (1984). Among other things, the shareholder may sue only the recipient of the allegedly excessive fees and bears the burden of proving the breach of fiduciary duty; recovery is limited to "actual damages" no more than the fee received; damages are recoverable only for the one-year period before suit was filed; and the shareholder has no right to jury trial. See 15 U.S.C. § 80a-35(b)(1),(3); Kalish v. Franklin Advisers, Inc., 928 F.2d 590, 591-92 (2d Cir. 1991).

A mutual fund shareholder bears a heavy burden in proving that an investment adviser received excessive compensation in violation of its fiduciary duty under ICA § 36(b). To violate section 36(b), "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining." Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982). This high threshold to recovery ensures against the use of section 36(b) as a vehicle to usurp the independent

directors' traditional role in evaluating and selecting the proper fee structure for a mutual fund. See, e.g., Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 971-72 (S.D.N.Y.), aff'd, 835 F.2d 45 (2d Cir. 1987) ("The legislative history of [section 36(b)] clearly indicates that it is not the role of the Court 'to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees.'" (quoting S. Rep. No. 184, 91st Cong., 1st Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 4897, 4902-03)).

**B.  Plaintiff Fails to Plead Facts Demonstrating that the Fund's Rule 12b-1 Fee Bears No Reasonable Relationship to the Services Rendered**

To state a claim under ICA § 36(b), plaintiff must plead facts demonstrating that the Fund's Rule 12b-1 fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining." Gartenberg, 694 F.2d at 928. The Complaint falls far short of this pleading standard.

The crux of the Complaint is that Rule 12b-1 expenses are unnecessary because the Fund is not currently soliciting investors new to the Trust. The Complaint thus boils down to a single, conclusory assertion: That any amount of Rule 12b-1 expense is excessive because there allegedly is "no need to further market and distribute the Closed Fund." ¶ 17; see also ¶ 3 (alleging that Rule 12b-1 expenses result in "excessive compensation" where Fund does not solicit new investors),

¶ 19(B) & (E) (alleging that once closed to new investors, Fund does not receive "adequate or reasonable consideration" in exchange for 12b-1 expenses).

To avoid dismissal, however, "a complaint may not simply allege in a conclusory manner" that the fees at issue "are excessive." Levy v. Alliance Capital Mgmt. L.P., No. 97 Civ. 4672 (DC), 1998 WL 744005, at *2 (S.D.N.Y. Oct. 26, 1998), aff'd, 189 F.3d 461 (2d Cir. 1999) (dismissing ICA § 36(b) claim). Rather, "plaintiff must allege facts that, if true, would support a claim that the fees at issue are excessive." Id. Here, however, plaintiff's bare allegation that the Fund's Rule 12b-1 expenses are wholly unnecessary because the Fund is closed "is merely a pleading of a conclusion of fact. It does not indicate in any way that the fees are disproportionately large, that they bear no relationship to the services rendered or that they could not have been the product of arm length bargaining." Wexler v. Equitable Capital Mgmt. Corp., No. 93 Civ. 3834 (RPP), 1994 WL 48807, at *4 (S.D.N.Y. Feb. 17, 1994).

The Complaint ignores each of the six factors to be considered in determining whether the fee at issue is so disproportionately large that it bears no reasonable relationship to the services rendered, as required to state a claim under ICA § 36(b): (1) the nature and quality of services provided to Fund shareholders; (2) the Fund's profitability to the adviser; (3) fall-out benefits (which, here, are benefits

other than the 12b-1 fee that allegedly accrue to BB&A as a
result of the Plan); (4) economies of scale; (5) comparative fee
structures; and (6) the trustees' independence and
conscientiousness. Gartenberg, 694 F.2d at 929-30. Plaintiff
cannot overcome this deficiency. See, e.g., Levy, 1998 WL 74005
at *4 (dismissing action where complaint "fails to explain how
the fees and expenses are excessive in light of the 'Gartenberg'
factors that courts consider").

1.  **The Complaint Alleges No Facts Addressing the
    Relationship between the Fund's Rule 12b-1
    Expenses and the Services Rendered**

Particularly glaring -- and crippling to plaintiff's
cause -- is the Complaint's failure to plead facts addressing
the nature and quality of the services provided to the Fund and
its shareholders now that the Fund is closed to new investors.
Common sense dictates that "to determine whether a fee is
excessive for purposes of Section 36(b), a court must examine
the relationship between the fees charged and the services
rendered by the investment adviser." Migdal v. Rowe Price-
Fleming Int'l Inc., 248 F.3d 321, 327 (4th Cir. 2001) (citing
Gartenberg, 694 F.2d at 928). Accordingly, the Complaint must
plead facts demonstrating that the nature and quality of the
services rendered cannot justify the challenged fee.

Here, however, the Complaint nowhere addresses -- as
it must -- the relationship between the fee charged and the
services rendered once the Fund was closed to new investors. In

14

fact, the Complaint pleads nothing about the services actually provided to the Fund and its shareholders pursuant to the Distribution Plan now that the Fund is closed to investors new to the Trust.  This omission is all the more striking given the Complaint's admission that pure "marketing and distribution services" -- an undefined term that presumably refers to the ongoing advertising and selling of Fund shares -- are far from the only services covered by the Fund's Rule 12b-1 expenses. See ¶ 9 (alleging that challenged expenses cover "<u>among other things</u>, marketing and distribution services" (emphasis supplied)).  Nor does plaintiff plead any facts alleging that the specific fee at issue here -- 0.25% of the Micro-Cap Growth Fund's average daily net assets -- is excessive in light of the actual services provided after the Fund closed to new investors.

These failures doom plaintiff's claims under ICA § 36(b).  Courts routinely dismiss section 36(b) claims where the plaintiff alleges that the advisory fee is excessive because the fund purportedly underperformed, or because the fee increased substantially in recent years -- but alleges insufficient facts with respect to the services actually provided to the fund and its shareholders by the investment adviser.  In so doing, these courts make clear that allegations addressing the relationship between the challenged fee and the actual services rendered must lie at the heart of any section 36(b) claim.  <u>See</u>, <u>e.g.</u>, <u>Krantz v. Prudential Inv. Fund Mgmt.</u>

LLC, 305 F.3d 140, 143 (3d Cir. 2002) (upholding dismissal of excessive compensation claim where complaint did not allege facts pertinent to relationship between fees and services, nor "facts indicating that the fees were received were disproportionate to the services rendered"); Migdal, 248 F.3d at 327 (upholding dismissal where "while plaintiffs have challenged the fees that defendants charged, they have failed to allege sufficient facts about the services that defendants offered in return for those fees"); Strougo v. Scudder, Stevens & Clark, Inc., 964 F. Supp. 785, 805 (S.D.N.Y. 1997) (dismissing § 36(b) claim where plaintiff failed to make allegations concerning nature of services rendered by adviser); Levy, 1998 WL 744005, at *4 (dismissing claim where plaintiff failed to allege that "particular fees and expenses bear no relationship to the services rendered"); King v. Douglass, 973 F. Supp. 707, 722-23 (S.D. Tex. 1996) (dismissing claim where plaintiff alleged that adviser received disproportionately large fee compared to fees paid by other mutual funds, but failed to allege that fee was not commensurate with services provided).

The same is true here. As in those cases in which the plaintiffs alleged only that the adviser's fee had substantially increased, or the fund had underperformed, the Complaint charges only that the Fund's Rule 12b-1 fee is excessive because the Fund is closed to new investors -- without ever alleging any facts about the actual services currently provided pursuant to

the Distribution Plan.  Accordingly, the Complaint pleads no

facts demonstrating that the Fund's Rule 12b-1 expenses are so

disproportionately large that they bear no reasonable

relationship to the services rendered, as is required to state a

claim.  This Court thus need go no further to dismiss the claim

against BB&A for breach of fiduciary duty under ICA § 36(b).

Regardless, a review of the types of allegations

missing from the Complaint -- and that can never be included

therein -- makes clear that the Complaint is fatally deficient:

- <u>The Complaint does not -- and cannot -- allege</u>
<u>that services provided to existing Fund shareholders cease once</u>
<u>the Fund is closed to new investors.</u>  The Distribution Plan

contemplates payments to dealers or others for providing ongoing

services to Fund shareholders.  Plan (Ex. D) ¶ 1; <u>see also</u>

<u>Charter Total Return Fund</u>, SEC No-Action Letter, 1989 WL 246220

(June 20, 1989) (payments to brokers for shareholder services

permissible only pursuant to 12b-1 plan).  Such services include

monitoring dividend payments; maintaining customer accounts and

records; processing bank wires and purchase and redemption

requests; and facilitating communications -- each of which

continues even after the Fund is closed.  Plan (Ex. D) ¶ 1.

- <u>The Complaint does not -- and cannot -- allege</u>
<u>that current shareholders are "locked-in" to the Fund, such that</u>
<u>they cannot reduce or altogether eliminate their investment.</u>
The Distribution Plan expressly states that Rule 12b-1 expenses

may be used to pay broker-dealers for "aiding in maintaining the investment of their respective customers in the Fund." Plan (Ex. D) ¶ 1. Even though the Fund is closed to new investors, continued payments to the broker-dealers of current shareholders encourage those brokers to maintain their clients' assets in the Fund and thus preserve the Fund's stockholder base. See <u>Krinsk v. Fund Asset Mgmt., Inc.</u>, 715 F. Supp. 472, 501 (S.D.N.Y. 1988), <u>aff'd</u>, 875 F.2d 404 (2d Cir. 1989) (upholding payments to financial consultants pursuant to Rule 12b-1 with purpose of maintaining fund size and halting out-flow of assets).

- <u>The Complaint does not -- and cannot -- allege that payments to broker-dealers for prior sales and marketing efforts stop once the Fund is closed.</u> As the SEC has explained: "Rule 12b-1 permits a fund to spread its distribution expenses over several years and allows payment of fees for past distribution services. Therefore, even if a fund closes to new investors, it may continue to pay rule 12b-1 fees in order to compensate the distributor for its past distribution efforts." <u>See</u> Memorandum, "Chairman Dingell's Inquiry Concerning Rule 12b-1 Fees," Barbara J. Green, Deputy Director, SEC Div. of Inv. Mgmt., dated Aug. 16, 1993, at 2-3 (Ex. F). Accordingly, when -- as here -- a fund is closed to new investors, it may continue to bear Rule 12b-1 expenses to fulfill obligations for past sales and marketing efforts. <u>See also</u> Rochelle Kauffman & Diane E. Ambler, <u>The Financing of Mutual Fund "B Share" Arrangements</u>,

52 Bus. Law. 1385, 1385 (Aug. 1997) ("The distributor is reimbursed over time by the fund [for the costs of brokers' commissions or other expenses] through payment of the fund's distribution plan . . . . Because the total annual payment made to the distributor under the 12b-1 plan may be less than the distribution expenses incurred in that year, it may take several years before the distributor is reimbursed fully.").

- The Complaint does not -- and cannot -- allege that the Fund is closed to further investment. Two groups of investors may continue to purchase Fund shares: (1) current Fund shareholders may buy more shares, and (2) shareholders of the Trust's other mutual funds may exchange into the Micro-Cap Growth Fund to open a new account. See Supplement (Ex. E).

In short, plaintiff does not -- because he cannot -- allege facts demonstrating that the Fund's Rule 12b-1 fee is so disproportionately large that it bears no reasonable relationship to the services rendered. Particularly where plaintiff already once has amended his complaint to flesh out his allegations, he should not be granted a third bite of the apple, and his claims should be dismissed with prejudice.

## 2. The Disinterested Trustees' Continued Approval of the Plan Provides a Separate Ground for Dismissal

Plaintiff's failure to allege any facts demonstrating that the disinterested trustees did not act independently and conscientiously in continuing the Distribution Plan provides a

separate and independent reason to dismiss the section 36(b) claim. "The expertise of the trustees, whether they are fully informed, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined in evaluating the reasonableness of compensation under section 36(b)." Krinsk, 875 F.2d at 412 (finding that trustees acted independently and conscientiously in approving Rule 12b-1 fee).

Courts uniformly have recognized that, absent separate indication that the challenged fees were excessive -- either because not commensurate with the services rendered, or not fairly disclosed to fund directors -- a court must honor Congress' directive not to "substitute its business judgment for that of a mutual fund's board of directors in the area of management fees." See Green, 295 F.3d at 745 (holding that advisory fees were not excessive where disinterested directors approved advisory compensation agreements); Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222, 1226-27 (S.D.N.Y. 1990), aff'd, 928 F.2d 590 (2d Cir. 1991) (same); Krinsk, 715 F. Supp. 2d at 485 (same); Investment Company Amendments Act of 1970, S. Rep. No. 91-184 at 6 (1969), reprinted in 1970 U.S.C.C.A.N. at 4903 ("A responsible determination regarding the management fee by the directors, including a majority of disinterested directors, is not to be ignored.").

The Complaint does not -- again because it cannot -- allege that the Distribution Plan and ensuing expenses were not approved by a majority of the independent trustees, as required by Rule 12b-1.  Nor does the Complaint allege any fact that, if true, would show that the Board failed to exercise independence or care in approving and maintaining the Distribution Plan pursuant to the requirements of Rule 12b-1.  Instead, the Complaint alleges only that the Board is "dominated and controlled" by Bjurman and Barry because they "hand-picked" the non-affiliated trustees, who thus purportedly "owe their positions and loyalties to the two interested defendants." ¶ 19.[2] These purely conclusory allegations cannot stave off dismissal.

"While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996).  This is particularly true

_____

[2] No more than a red herring is plaintiff's additional allegation that the trustees improperly permitted continued imposition of the Rule 12b-1 fee, without seeking or obtaining shareholder approval.  ¶¶ 19(B),(E),(F), 32(b).  Shareholder approval is required only for amendments to the Plan that increase materially the amounts to be spent for services thereunder.  See 17 C.F.R. § 270.12b-1(b)(4) (2004); Plan ¶ 6 (Ex. D).  Plaintiff cannot allege that the Board amended the Plan in any fashion, let alone to increase materially the amounts spent under the Plan.  See, e.g., Bildstein v. Dreyfus/Laurel Funds, Inc., No. 97 Civ. 8919 (DC), Fed. Sec. L. Rep. ¶ 90,473, 1999 WL 177349, at *3 (S.D.N.Y. Mar. 30, 1999) (dismissing suit challenging amendments to distribution plan, where "both Rule 12b-1 and the Plan itself permit the actions that plaintiffs contend were unlawful"), aff'd, 201 F.3d 430 (2d Cir. 1999).

given the ICA's statutory presumption against a finding that an independent trustee -- one with no financial interest in the investment adviser -- nonetheless is "controlled" by the investment adviser or is otherwise "interested." See 15 U.S.C. § 80a-2(a)(6),(9) (2000). Courts uniformly have upheld the independence of outside trustees with far more pervasive ties to the investment adviser. Krantz, 305 F.3d at 143-44 (dismissing allegations that independent directors were "interested" or "controlled" because they sat on multiple boards for investment adviser and received aggregate compensation of up to $135,000); Migdal, 248 F.3d at 329-30 (directors sat on up to 39 boards and received aggregate compensation of up to $81,000); Verkouteren v. Blackrock Fin. Mgmt., Inc., 37 F. Supp. 2d 256, 258-61 (S.D.N.Y. 1999) (directors sat on more than 20 boards and received aggregate compensation between $140,000 and $160,000).

As in these cases, the Complaint alleges no facts that would demonstrate that BB&A actually dominated and controlled the independent trustees. See also Verkouteren v. Blackrock Fin. Mgmt., Inc., No. 98 Civ. 4673 (WK), 1999 WL 511411, at *4 (S.D.N.Y. July 20, 1999) (dismissing claim of control where, inter alia, disinterested trustees were elected by shareholders, adviser lacked power to set trustees' compensation, and plaintiff could not allege compensation affected trustees' independent judgment), aff'd, 208 F.3d 204 (2d Cir. 2000); Olesh v. Dreyfus Corp., Fed. Sec. L. Rep. ¶ 98,907, 1995 WL 500491, at

22

*16 (E.D.N.Y. Aug. 8, 1995) (proof of control requires evidence of "actual domination and operation," not "mere influence").

Plaintiff nowhere disputes that the independent trustees approved the continuation of the Fund's Distribution Plan.  Given Congress' mandate that independent trustees bear the primary responsibility to protect shareholders' interests -- and the absence of any factual allegations challenging the trustees' independence -- this determination provides a further, independent reason to dismiss plaintiff's section 36(b) claim. See Tannenbaum v. Zeller, 552 F.2d 402, 406 (2d Cir. 1977) (Congress placed "unaffiliated directors in the role of 'independent watchdogs' who would assure that . . . mutual funds would operate in the interest of all . . . securities holders").

POINT II.

THE COMPLAINT STATES NO CLAIM UNDER DELAWARE STATE LAW

Plaintiff fares no better with his Delaware state law claims against BB&A and the individual trustees.  These, too, should be dismissed with prejudice, both (1) for failure to make demand on the Board before filing suit, and (2) on their merits.

**A.    Plaintiff's State Law Claims Should Be Dismissed for Failure to Make Demand on the Board of Trustees**

Plaintiff's state law claims merit dismissal pursuant to Delaware Court of Chancery Rule 23.1 for failure to make demand on the Board or adequately to plead why demand would be futile.  Where plaintiff chose not to make a demand on the

23

Board, he must state with particularity the reasons that demand would be futile. Del Ct. Ch. R. 23.1. "Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. . . .  What the pleader must set forth are particularized factual statements that are essential to the claim. . . .  A prolix complaint larded with conclusory language . . . does not comply with these fundamental pleading standards." Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000) (footnotes omitted).

The Complaint nowhere pleads the particularized facts required to create a reason to doubt that (1) the majority of directors are disinterested and independent, or (2) the challenged transaction was properly the product of business judgment. Brehm, 746 A.2d at 256-57; Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984).  Plaintiff's conclusory allegations as to the outside trustees' purported lack of independence and care (see ¶¶ 19, 32; supra Point I) in no way render demand futile.

As detailed supra at Point I.B., plaintiff alleges no particularized facts "as would demonstrate that through personal or other relationships the directors are beholden to the [alleged] controlling person. . . .  The shorthand shibboleth of 'dominated and controlled' directors is insufficient." Aronson, 473 A.2d at 816; see also White v. Panic, 793 A.2d 356, 366 (Del. Ch. 2000) (holding that $31,000 compensation annually did not render directors beholden to insider and that "the law is

24

well-settled that [insider's] involvement in selecting each of the directors is insufficient to create a reasonable doubt about their independence"). Nor does plaintiff allege that the non-affiliated trustees received material financial benefit from continuing the Plan. See Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 362 (Del. 1993) (defining director self-interest).[3]

The Complaint likewise fails to allege sufficient facts to doubt that the Board's decision was the product of business judgment. Plaintiff does not set forth particularized facts sufficient to rebut the presumption that the business judgment rule applies, by raising reason to doubt either that (1) the action was taken honestly and in good faith, or (2) the Board was adequately informed in making the decision. See Levine v. Smith, 591 A.2d 194, 205-06 (Del. 1991); Aronson, 473 A.2d at 814-15. Instead, plaintiff again trots out conclusions of law masquerading as allegations of fact -- claiming that the "challenged transaction were not the product of a valid business judgment because . . . [they] amount[] to corporate waste" and

---

[3] Plaintiff also may not unilaterally render outside trustees interested or dependent by naming them as defendants. See ¶ 19(F). Except in "egregious circumstances," the "mere threat" of personal liability does not constitute a disabling interest for a director considering a derivative plaintiff's demand. H-M Wexford LLC v. Encorp, Inc., 2003 WL 21254843, at *14 (Del. Ch. May 27, 2003) (citing Aronson, 473 A.2d at 815; Malpiede v. Towson, 780 A.2d 1075, 1085 (Del. 2001)). To hold otherwise would mandate a finding of futility whenever a majority of the board members is sued.

that the "trustees breached their duty of due care." ¶ 19(B),

(E). Entirely missing are particularized allegations that even

remotely suggest the trustees acted dishonestly, in bad faith,

or without a rational business purpose in permitting the Plan to

remain in effect. See supra Point I.A; infra Point II.B.

Because plaintiff utterly has failed to plead the

required particularized facts to excuse demand under Delaware

law, his state law claims should be dismissed.

**B.   The Complaint Fails to State a Claim under Delaware
Law for Breach of Fiduciary Duties or Corporate Waste**

Regardless, plaintiff's state law claims -- alleging

(1) breach of defendants' fiduciary duty of due care and

loyalty, and (2) corporate waste -- also warrant dismissal for

failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Under Delaware's business judgment rule, courts must

presume "that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the

honest belief that the action taken was in the best interests of

the company." Aronson, 473 A.2d at 811. "The rule posits a

powerful presumption in favor of actions taken by the directors

in that a decision of a loyal and informed board will not be

overturned unless it cannot be 'attributed to any rational

business purpose.'" Cede, 634 A.2d at 361 (citation omitted).

The state law breach of fiduciary duties claims cannot overcome

this burden. The Complaint alleges only that any amount of

continued Rule 12b-1 expenses is unnecessary because the Fund is not currently marketed or distributed to new shareholders. <u>See</u>, <u>e.g.</u>, ¶¶ 1, 9, 17. Plaintiff pleads no facts demonstrating that the trustees failed to consider all material information reasonably available, or that their decision-making process was grossly negligent. <u>See Brehm</u>, 746 A.2d at 259 (outlining duty of due care); <u>In re Nat'l Auto Credit, Inc. S'holders Litig.</u>, No. Civ.A.19028, 2003 WL 139768, at *12 (Del. Ch. Jan. 10, 2003) (dismissing duty of care claim where complaint "set forth nothing but conclusory descriptions of any deficiency in the Board's decision-making process"). Nor, given the lack of any actionable allegations of interest or lack of independence, does the Complaint state a claim for breach of the duty of loyalty. <u>See Cinerama, Inc. v. Technicolor, Inc.</u>, 663 A.2d 1156, 1158 (Del. 1995) (where minority of board allegedly has financial interest in transaction, to rebut presumption of business judgment rule under duty of loyalty, plaintiff must show that interested directors control or dominate board as a whole).

Plaintiff's corporate waste claim is likewise deficient. "Directors are guilty of corporate waste, only when they authorize an exchange that is so one-sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." <u>Glazer v. Zapata Corp.</u>, 658 A.2d 176, 183 (Del. Ch. 1993). The Complaint does no more than assert that the trustees "wasted corporate

assets by causing the Closed Fund to pay unnecessary fees for marketing and distribution." ¶ 37.  Plaintiff alleges nothing about the services actually rendered to the Fund and its shareholders under the Distribution Plan even though the Fund is closed to new investors.  See supra Point I.A.  The Complaint thus sets forth no factual allegations to support plaintiff's repeated insistence that the Fund "received no adequate or reasonable consideration" -- particularly given the myriad services expressly allowed for in the Plan that continue despite the Fund's closure to new investors.  See Brehm, 746 A.2d at 263 (corporate waste claims "are confined to unconscionable cases where directors irrationally squander or give away corporate assets"); In re The Limited, Inc. S'holders Litig., 2002 WL 537692, at *9 (Del. Ch. Mar. 27, 2002) (dismissing corporate waste claim because, where "reasonable, informed minds might disagree on the question, . . . . a reviewing court will not attempt to itself evaluate the wisdom of the bargain or the adequacy of the consideration").

### CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court enter an order dismissing the First Amended Complaint with prejudice.

Dated:    New York, New York
          March 25, 2004

                              Respectfully submitted,

                              GIBSON, DUNN & CRUTCHER LLP

                              By: _____
                                  Mitchell A. Karlan (MK-4413)
                                  Michael M. Krauss (MK-9699)
                                  200 Park Avenue -- 47th Floor
                                  New York, New York 10166-0193

                                  Telephone: (212) 351-4000
                                  Facsimile: (212) 351-4035

                                  Attorneys for Defendants

80288921v1

29

## CERTIFICATE OF SERVICE

I, Michael M. Krauss, an associate with Gibson, Dunn & Crutcher LLP, hereby certify that on March 25, 2004, I caused a copy of the foregoing Notice of Motion, Memorandum of Law, and Declaration of Mitchell A. Karlan, dated March 25, 2004, with attached exhibits, to be served by Federal Express upon the following:

Eduard Korsinsky, Esq.
Zimmerman, Levi & Korsinsky LLP
39 Broadway, Suite 1440
New York, New York  10006
Telephone:  (212) 363-7500
Facsimile:  (212) 363-7171

Dated:    New York, New York
          March 25, 2004

MICHAEL M. KRAUSS
Tel:  (212) 351-3996

Document3